**SECURITIES INDUSTRY ASSOCIATION, Plaintiff,**

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, et al., Defendants,**

**Bankers Trust Company, Defendant-Intervenor.**

**Civ. A. No. 80–2730.**

United States District Court, District of Columbia.

Feb. 4, 1986.

---

John M. Liftin, James B. Weidner, David A. Schulz, Alejandro E. Camacho, Rogers & Wells, Washington, D.C., for plaintiff.

Michael Bradfield, Gen. Counsel, Richard M. Ashton, Associate Gen. Counsel, Kay E. Bondehagen, Board of Governors of F.R.S., Washington, D.C., for defendants.

John W. Barnum, Laura B. Hoguet, W. Michael Tupman, Craig Alan Wilson, White & Case, Washington, D.C., for defendant-intervenor.

G. Duane Vieth, Leonard H. Becker, Daniel I. Prywes, Peter K. Kautsky, Arnold & Porter, Washington, D.C., for amicus curiae Goldman, Sachs & Co.

Harvey L. Pitt, Henry A. Hubschman, David M. Miles, Fried, Frank, Harris, Shriver & Jacobson, Washington, D.C., for amicus curiae Investment Co. Institute.

Michael S. Helfer, Russell J. Bruemmer, Wilmer, Cutler & Pickering, Washington, D.C., for amici curiae America N.T. & S.A., Citibank, N.A., First Nat. Bank of Boston, First Nat. Bank of Minneapolis, NCNB Nat. Bank of North Carolina, Security Pacific Nat. Bank, and Sovran Bank, N.A.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Plaintiff, Securities Industry Association ("SIA"), a trade association representing the nation's securities dealers and underwriters, challenges a decision of the Federal Reserve Board ("Board") permitting Bankers Trust Company to place commercial paper with investors on behalf of issuers under certain prescribed conditions. Specifically, in its ruling of June 4, 1985, the Board determined that Bankers Trust's commercial paper placement activities did not constitute "selling," "underwriting," or "distributing" commercial paper securities for purposes of the Glass-Steagall Act, which generally prohibits banks from underwriting or dealing in securities. The SIA contends that the Board's interpretation of the Act is incorrect as a matter of law and that its ruling must therefore be set aside. The Board, along with defendant-intervenor Bankers Trust (hereinafter referred to collectively as "defendants"), oppose the SIA's motion for summary judgment and have filed cross motions for summary judgment. For the reasons set forth below, the Court concludes that Bankers Trust's commercial paper activities do indeed violate the strictures of the Glass-Steagall Act and that the Board's contrary ruling must therefore be invalidated.

### I. Background

The Court is well-acquainted with the parties to this action and their dispute, which began in 1979 and has already wound its way once through the entirety of the federal judicial system. In January 1979, plaintiff SIA and A.G. Becker, Inc., a commercial paper dealer, requested that the Board prohibit Bankers Trust from selling commercial paper issued by companies not related to the bank,[1] claiming that such sales were prohibited by certain provisions of the Banking Act of 1933, commonly referred to as the Glass-Steagall Act. Section 16 of the Act, 12 U.S.C. § 24 Seventh (1982), bars national banks from dealing in securities, except purchases and sales made, without recourse, upon the order and for the account of bank customers, while section 21, 12 U.S.C. § 378(a)(1) (1982), prohibits banks from "issuing, underwriting, selling or distributing" securities. Responding to the petitions of SIA and Becker in September, 1980, the Board took the

---

1. The Court offers, as it did in its previous disposition of this case, the following definition of commercial paper, found in Comment, *The Commercial Paper Market and the Securities Acts,* 39 U.Chi.L.Rev. 362, 363–64 (1972):

"Commercial paper consists of unsecured, short-term promissory notes issued by sales and personal finance companies; by manufacturing, transportation, trade, and utility companies; and by the affiliates and subsidiaries of commercial banks. The notes are payable to the bearer on a stated maturity date. Maturities range from one day to nine months, but most paper carries an original maturity between thirty and ninety days. When the paper becomes due, it is generally rolled over—that is, reissued—to the same or a different investor at the market rate at the time of maturity."

position that the financial instruments sold by Bankers Trust—prime quality third-party commercial paper with a maturity of nine months or less, sold in large denominations to sophisticated customers—were not "notes or other securities" for purposes of the Glass-Steagall Act, and that Bankers Trust's sales were therefore legal. Shortly thereafter, Becker and the SIA commenced suit in this Court, seeking review of the Board's conclusion. In a decision dated July 28, 1981, this Court ruled that commercial paper was in fact a "note[ ] or other securit[y]" within the meaning of the Act, and therefore invalidated the Board's decision. *A.G. Becker, Inc. v. Board of Governors of the Federal Reserve System*, 519 F.Supp. 602 (D.D.C.1981). A divided panel of the Court of Appeals reversed that judgment, adopting the Board's reasoning, *A.G. Becker, Inc. v. Board of Governors of the Federal Reserve System*, 693 F.2d 136 (D.C.Cir.1982), but the Supreme Court overturned the Court of Appeal's decision and reinstated this Court's holding that commercial paper is comprehended by the literal language of the statute, and that the inclusion of such financial instruments within the Act's terms is fully consistent with its purposes. *Securities Industry Association v. Board of Governors of the Federal Reserve System*, 468 U.S. 137, 104 S.Ct. 2979, 82 L.Ed.2d 107 (1984) (*"SIA"*). The Supreme Court, however, expressed no opinion as to whether Bankers Trust's placement activities constituted "underwriting," "issuing," "selling" or "distributing" within the meaning of the statute, and therefore remanded the case for determination of that question. *Id.* at ——, 104 S.Ct. at 2992. In an Order dated October 19, 1984, this Court remanded the case to the Board so that it might consider the "underwriting" issue in the first instance.

In order that the contentions of the parties and the conclusions of the Court may be better understood, it is necessary to set out Bankers Trust's activities in some detail. In 1978, the bank first began offering for sale third-party commercial paper, soliciting purchasers through advertisements announcing its placement services. The bank also initiated a marketing campaign aimed at issuers of commercial paper, promising to perform services competitive with securities dealers. Chief among these services was Bankers Trust's offer to extend short-term credit to commercial paper issuers to cover the unsold portions of any given issue, at interest rates equal to or near the rates borne by the paper. Following the Supreme Court's decision, the Board notified Bankers Trust by letter dated December 3, 1984, that this practice of extending back-up credit to issuers "appears to be the economic equivalent of buying some of the unsold issue with the bank's own funds, an activity that would appear to be prohibited by the [Glass-Steagall] Act." Statement Concerning Applicability of the Glass-Steagall Act to the Commercial Paper Placement Activities of Bankers Trust Company at 3 (June 4, 1985) ("June 4, 1985 Statement"). As this conclusion was based upon Bankers Trust's 1980 placement activities, the Board offered the bank an opportunity to provide information concerning its more recent placement methods, and also solicited comments from interested parties, including, among others, the SIA.

The bank's current activities in the commercial paper market, which are described in the Board's June 4, 1985 Statement and lie at the heart of the present dispute, differ in several material respects from its 1980 placement methods. Bankers Trust still assists issuers in placing their paper with large financial institutions, advising client issuers with respect to the rates and maturities of a proposed issue that are likely to be accepted, soliciting potential purchasers and selling the paper to them. The bank, however, no longer lends short-term funds to issuers at or near the rates of interest of the paper being placed. It does not purchase or repurchase the paper, inventory it overnight, or take any ownership interest in the paper. Nor does the bank make loans on the paper, as it used to, or take the paper as collateral for loans. Finally, the bank enters into no repurchase, endorsement or other guarantee arrange-

ment with purchasers of the paper. June 4, 1985 Statement at 4–5.

In its June 4, 1985 Statement, the Board concluded that Bankers Trust is not engaged in "distributing" or "underwriting" securities under section 21 of the Glass-Steagall Act, because its current placement activities do not involve public offerings as that term is defined under the federal securities law. While Bankers Trust is involved in "selling" securities, the Board found that the bank does so without recourse, upon the order and for the account of its customers, and that its sales therefore fall within the "permissive phrase" of section 16 of the Act. Finally, the Board concluded that the bank's placement activities will not give rise to the hazards and financial dangers that the Glass-Steagall Act was designed to prevent, and that they therefore fall outside the scope of the Act.

Following the Board's decision, the parties filed the cross motions for summary judgment now before the Court, and various *amici* filed supporting memoranda. Oral argument on the motions was held on September 19, 1985.

## II. *Discussion*

■ The Board, of course, is the agency charged with regulating the national banking system, and as such has primary responsibility for implementing the Glass-Steagall Act. SIA, 468 U.S. at ——, 104 S.Ct. at 2983. Courts, therefore, are to "accord substantial deference to the Board's interpretation of that Act whenever its interpretation provides a reasonable construction of the statutory language and is consistent with legislative intent." *Securities Industry Ass'n v. Board of Governors*, 468 U.S. 207, ——, 104 S.Ct. 3003, 3009, 82 L.Ed.2d 158 (1984) *("Schwab")*. The Supreme Court has made clear, however, that the deference owed is not so

great as to convert judicial review into a rubber stamp for Board decisions. Under the standard enunciated in *SIA*, courts are to determine for themselves the congressional intent underlying a given banking statute, and "'must reject administrative constructions of [that] statute ... that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement.'" *SIA*, 468 U.S. at ——, 104 S.Ct. at 2983 (quoting *Federal Election Comm'n v. Democratic Senatorial Campaign Comm'n*, 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981)).

The Glass-Steagall Act was passed in 1933, in response to the banking collapse that ushered in the Great Depression of the 1930's. The Act reflected the widely-held view that the depth of the nation's financial crisis was attributable in large measure to the extensive participation of commercial banks in speculative investment banking activities. In order to restore public confidence in commercial banks as depository institutions, and to prevent future financial disasters, Congress sought "[t]hrough flat prohibitions ... to 'separat[e] as completely as possible commercial from investment banking.'" *SIA*, 468 U.S. at ——, 104 S.Ct. at 2985 (quoting *Board of Governors v. Investment Company Institute*, 450 U.S. 46, 70, 101 S.Ct. 973, 989, 67 L.Ed.2d 36 (1981) *("ICI")*). The two principal prohibitions designed to effect such a separation are found in sections 16 and 21 of the Act. Section 21 prevents persons or firms involved in investment banking activities from engaging in commercial banking by making it illegal for any person "engaged in the business of issuing, underwriting, selling or distributing ... stocks, bonds, debentures, notes or other securities to engage ... in the business of receiving deposits...." 12 U.S.C. § 378.[2] Section 16 en-

---

2. Section 21 provides, in pertinent part:

"it shall be unlawful—

(1) For any person, firm, corporation, association, business trust, or other similar organization, engaged in the business of issuing, underwriting, selling, or distributing, at wholesale or retail, or through syndicate participation, stocks, bonds, debentures, notes, or other secu-

rities, to engage at the same time to any extent whatever in the business of receiving deposits subject to check or to repayment upon presentation of a passbook, certificate of deposit, or other evidence of debt, or upon request of the depositor: *Provided*, That the provisions of this paragraph shall not prohibit national banks or State banks or trust companies (whether or not

forces this prohibition from the other side of the equation. It provides that "[t]he business of dealing in securities and stock by [member banks] shall be limited to purchasing and selling such securities and stock without recourse, solely upon the order, and for the account of, customers, and in no case for its own account...." 12 U.S.C. § 24 Seventh. As Bankers Trust is a member bank in the business of receiving deposits, both sections apply to its activities. *SIA*, 468 U.S. at ——, 104 S.Ct. at 2986.

### A. *Bankers Trust's Activities As "Selling" Commercial Paper*

■ There can be no dispute that Bankers Trust "sells" commercial paper on behalf of issuers, and that its activities are therefore embraced by the literal terms of section 21, which broadly prohibits banks from "selling" securities. In its June 4, 1985 Statement, the Board took the position that because section 16 authorizes banks to engage to some extent in selling securities, section 21 should not be read as prohibiting sales activities expressly permitted by section 16. June 4, 1985 Statement at 9. Plaintiff challenges this construction of the Act. Noting that the terms of the statute are to be given their literal meaning, *ICI*, 450 U.S. at 65, 101 S.Ct. at 986, plaintiff argues that the term "selling" comprehends all sales activities— be they principal or agency transactions, private or public sales—and thus carves out no exception for sales authorized under section 16. Bankers Trust's activities are unlawful if prohibited by either section of the Act, *SIA*, 468 U.S. at ——, 104 S.Ct. at 2986, plaintiff claims, and thus because they fall within the plain meaning of section 21's broad prohibition, the bank's activities are illegal.

In advancing such an argument, however, the SIA ignores the Supreme Court's observation that sections 16 and 21 "seek to draw the same line." *Id.* Indeed, sec-

tion 21 expressly states that its provisions "shall not prohibit national banks ... from dealing in, underwriting, purchasing, and selling investment securities to the extent permitted ... by the provisions of section 24 of this title." 12 U.S.C. § 378(a)(1). Paragraph seventh of section 24, of course, is the codification of section 16 of the Glass-Steagall Act. Thus, section 21 would appear to incorporate by express reference the sales exception created by section 16. Even were this not the case, plaintiff's construction of the Act flies in the face of the maxim that the provisions of a statute should be read consistently with one another in order to give meaning to each, since Congress is presumed not to draft superfluous or insignificant language. *United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 49 L.Ed. 615 (1955); *Zeigler Coal Co. v. Kleppe*, 536 F.2d 398, 406 (D.C.Cir.1976). Under plaintiff's reading of the Act, section 16's carefully drafted exception to the general prohibition on the sale of securities would be rendered completely nugatory by section 21. Congress most certainly could not have intended such a result. The Court, therefore, finds that the Board's construction of section 21, which gives effect to section 16's permissive phrase, is both consistent with congressional intent and reasonable.

### 1. *Section 16's Permissive Phrase*

The relevant inquiry then, is whether Bankers Trust's sales activities fit within section 16's permissive phrase. In the Board's view, the bank's current placement methods satisfy each of the criteria set out in the section: the Board concluded that (1) the bank does not purchase the commercial paper for its own account or extend credit to the issuer in a manner that is the functional equivalent of purchasing the paper; (2) the bank does not assume any market risk for, or in any way guarantee, the paper it places; and finally (3) the bank

members of the Federal Reserve System) or other financial institutions or private bankers from dealing in, underwriting, purchasing, and selling investment securities, or issuing securi-

ties, to the extent permitted to national banking associations by the provisions of section 24 of this title...."

places the paper solely upon the order of its customer, the commercial paper issuer. June 4, 1985 Statement at 10. Plaintiff takes issue with each of these conclusions.

The first of these disputed findings raises several troublesome questions, particularly in light of the procedural posture of the case. In concluding that Bankers Trust does not purchase the securities for its own account, the Board relied upon the bank's submission that it no longer provides back-up credit to issuers to cover unsold portions of a commercial paper issue, and that where the bank does provide credit to an issuer, it does so as part of its ordinary commercial lending functions, in a manner unrelated to and independent of the bank's efforts to place the issuer's paper. June 4, 1985 Statement at 11–13. Indeed, the Board explicitly stated that its analysis of the bank's activities "is premised on the assumption that Bankers Trust does not provide its letter of credit to support a particular issue of commercial paper placed by the bank." *Id.* at 14 n. 13. As plaintiff notes, banks have a strong incentive to offer such credit to issuers, not only because they earn a fee on the loan, but because the credit enhances the marketability of the paper the bank is attempting to sell. *See SIA*, 468 U.S. at ——, 104 S.Ct. at 2989. The Board's answer to this concern, however, is to further assume that where the bank extends credit to an issuer, "it would do so under different terms, at different times, and for different purposes"; that the bank would keep appropriate records to demonstrate the independence of the loan and the issue of commercial paper; and that the bank would assure itself that any funds advanced would not be used to pay any paper placed by the bank or to

cover any unsold portion of an issue. June 4, 1985 Statement at 13. Plaintiff seriously challenges the validity of these assumptions, pointing to several advertisements and commercial paper rating service evaluations explicitly acknowledging that Bankers Trust backed certain issues through letters of credit.[3] These public announcements appeared prior to the Board's ruling and have continued since, *see* n. 3 *supra;* the most recent prompted a letter from the Board to the Court, explaining that the transaction at issue appeared to have been initiated prior to both the Board's ruling and the Board's December 1984 letter to the bank, and that in any event, the Board was investigating the matter and would take remedial action if necessary to insure that the bank is no longer extending credit to back the paper it places. Letter from Richard N. Ashton, counsel for the Board, to the Court (November 12, 1985).

This case, of course, is presently before the Court on cross-motions for summary judgment. Were the Court otherwise persuaded that the Board's ruling is correct and should be upheld, these public announcements, particularly those published since the Board's ruling, would preclude summary judgment for defendants, as they clearly raise questions of material fact. There can be no doubt that the Board's assumptions regarding the bank's lending practices are material to the case—they lie at the heart of the Board's determination that the bank no longer purchases the securities for its own account or otherwise assumes any market risk in connection with the paper. The public announcements cast serious doubt upon the validity of those assumptions and raise a host of factual questions—*e.g.*, do the announcements re-

---

**3.** Plaintiff attached to its Memorandum in Opposition to Defendants' Cross-Motion for Summary Judgment and in Support of Plaintiff's Motion for Further Summary Judgment, a "tombstone" advertisement that appeared in the February 28, 1985 *Wall Street Journal* which stated that Bankers Trust "initiated this program, provides letter of credit support, and acts as financial advisor, trustee and exclusive sales agent" for Renault Industrias Mexicana's commercial paper program. In a letter to the Court

dated October 10, 1985, plaintiff's counsel also attached *Moody's Commercial Paper Record* (October 1985) which rates the same commercial paper as prime 1 "based solely on the support provided by a letter of credit issued by Bankers Trust Company." At oral argument, however, counsel for Bankers Trust stated unequivocally that the bank no longer bears letter of credit risk on the Renault Industrias Mexicana transaction. Transcript of September 19, 1985 hearing at 51.

fer to transactions pre-dating the Board's ruling or its letter of December 1984? Can the Board adequately monitor the bank's lending practices to assure compliance with the ruling? could or should the bank have withdrawn the commercial paper issues in question following the Board's December 1984 letter?—that this Court is not prepared to answer on the basis of declarations made in the parties' papers. Because the Court is of the view that the Board's ruling is invalid for other reasons, however, it need not address such questions here.[4] For present purposes, therefore, the Court accepts as valid the Board's conclusion that Bankers Trust does not purchase, through loans or otherwise, the commercial paper it places.

■ Plaintiff next contends that regardless of whether the bank actually purchases the paper it places, it nevertheless assumes certain market risks in connection with its sale of the paper and therefore fails to satisfy the "without recourse" requirement of section 16. This is so, plaintiff argues, because in selling commercial paper the bank makes a number of implied representations concerning the creditworthiness of the paper; breach of these implied representations, plaintiff contends, creates potential liability under the federal securities laws, thereby permitting the purchaser of the paper to seek redress from the bank. This Circuit, however, has already rejected in a different context the SIA's claim that such contingent liability violates the "without recourse" provision of section 16. The ordinary commercial meaning of the phrase "without recourse" simply " 'prohibits banks from assuming the liability of endorser or maker with respect to the securities,' " but does not embrace incidental liability under the securities laws. *Securities Industry Ass'n v.*

*Comptroller of the Currency,* 577 F.Supp. 252, 257 (D.D.C.1983) (quoting *In re Bank America Corp.,* 69 Fed.Res.Bull. 105, 115 n. 50 (1983)), *aff'd per curiam,* 758 F.2d 739 (D.C.Cir.1985). *See also Securities Industry Ass'n v. Board of Governors,* 716 F.2d 92, 100 n. 4 (2d Cir.1983) (bank's brokerage activities do not violate section 16 merely because bank faces incidental liability to third party if brokerage customer breaches agreement to buy or sell security), *aff'd,* 468 U.S. 207, 104 S.Ct. 3003, 82 L.Ed.2d 158 (1984). Thus, if the Board's underlying assumptions about the bank's lending practices are accepted, Bankers Trust sells the commercial paper without recourse for purposes of the Act.

Section 16's final requirement is that the bank sell the securities "upon the order" of its customers. In the Board's view, Bankers Trust's activities comport with this requirement because (1) it is the issuer, not the bank, who decides whether to issue commercial paper and in what amount; (2) the issuer is clearly a customer of the bank; and (3) nothing in the statute requires that the customer have a pre-existing relationship with the bank. June 4, 1985 Statement at 16.

### 2. *The Act's Legislative History*

Having determined that Bankers Trust's activities fit neatly within the literal language of section 16's permissive phrase, the Board turned to the Act's legislative history, and concluded that the "placement of securities with a limited number of purchasers by a bank, acting solely as agent of an issuer, was not identified as a source of congressional concern." *Id.* at 18 (footnote omitted). The Board noted that nothing in the legislative history specifically prohibits banks from participating in the initial flota-

---

**4.** The public statements, and the Board's letter of November 12, 1985, in particular, are significant not only for their bearing on the validity of the Board's assumptions, but because they shed considerable light on the nature of the Board's ruling. In the previous round of this litigation, the Supreme Court admonished the Board for attempting to erect a regulatory framework under the Glass-Steagall Act, where the Act itself established flat prohibitions. "Congress," the Court stated, "rejected a regulatory approach when it drafted the statute, and it has adhered to that rejection ever since." *SIA,* 468 U.S. at ——, 104 S.Ct. at 2988. The Board's recent letter strongly suggests that it is again attempting to regulate the commercial paper placement activities of Bankers Trust through bank examinations and investigations.

tion of securities, and thus it found no reason not to apply the statutory language literally. The fact that banks never engaged in such activities prior to passage of the Act, or in the fifty years following its enactment, is in the Board's view insignificant, and simply reflects the previous lack of economic incentive to provide such services. *Id.* at 20.

It is here that the Court parts company with the Board. As plaintiff notes, the Glass-Steagall Act sets out a series of "flat prohibitions," *SIA,* 468 U.S. at ——, 104 S.Ct. at 2985, and it is against this framework that section 16's narrow exception is to be gauged. The Board, by contrast, starts its analysis from an entirely different perspective: rather than asking whether, in view of the statute's prohibitions, the legislative history supports the authorization that the Board has found in section 16, the Board instead looks to see whether there are any statements in the debates or hearings on the bill that demonstrate congressional disapproval of such an authorization. The Board has thus asked the wrong question and in so doing, plaintiff submits, has "transform[ed] a narrow exception addressed to a completely different activity into an expansive authorization that defeats the prohibition intended." Plaintiff's Motion at 26. The Court agrees.

As noted previously, Congress designed the Glass-Steagall Act "to 'separat[e] as completely as possible commercial from investment banking.'" *SIA,* 468 U.S. at ——, 104 S.Ct. at 2985 (quoting *ICI,* 450 U.S. at 70, 101 S.Ct. at 989). Such a separation was necessary, Congress believed, not only to protect bank assets from imprudent securities investments, but also to forestall the more subtle hazards that arise when a bank is cast in the role of sole promoter for specific securities. In Congress' view "the promotional incentives of investment banking and the investment banker's pecuniary stake in the success of particular investment opportunities was destructive of prudent and disinterested commercial banking and of public confidence in the commercial banking system." *Investment Company Institute v. Camp,* 401

U.S. 617, 634, 91 S.Ct. 1091, 1100, 28 L.Ed.2d 367 (1971) ("*Camp*"). Senator Bulkley, one of the Act's principal sponsors, noted that

the banker who has nothing to sell to his depositors is much better qualified to advise disinterestedly and to regard diligently the safety of depositors than the banker who uses the list of depositors in his savings department to distribute circulars concerning the advantages of this, that, or the other investment on which the bank is to receive an originating profit or an underwriting profit or a distribution profit or a trading profit or any combination of such profits.

75 Cong.Rec. 9912 (1932). In addition to the conflicts of interest that result when a bank acts as both promoter of securities and investment adviser to its depositers, Congress feared the promotional pressures that might lead banks to misuse their credit facilities in order to advance their investment banking activities. Thus, Congress expressed concern that banks might extend credit to shore up a company for which they distribute securities; or that banks would be tempted to make imprudent loans either to companies in whose securities they have a promotional stake or to purchasers of those securities; or that banks might pressure companies to which they have made loans to issue securities through the banks' distribution systems. *See SIA,* 468 U.S. at ——, 104 S.Ct. at 2985; *Camp,* 401 U.S. at 633, 91 S.Ct. at 1100. In short, Congress viewed certain investment banking activities as "fundamentally incompatible with commercial banking" and therefore created "a broad structur[e] ... that would 'surround the banking business with sound rules which recognize the imperfection of human nature that our bankers may not be led into temptation, the evil effect of which is sometimes so subtle as not to be easily recognized by the most honorable man.'" *SIA,* 468 U.S. at ——, 104 S.Ct. at 2985 (quoting Sen. Bulkley, 75 Cong.Rec. 9912).

It is against the backdrop of these congressional concerns that the scope of sec-

tion 16's sales authorization is to be determined. Given the structure of the statute, that authorization is necessarily a narrow one. Section 21 bans all "selling" of securities by persons who receive deposits, while section 16 bars banks from dealing in securities except for sales and purchases made, without recourse, upon the order and for the account of customers. As the Supreme Court has elsewhere noted, section 16's permissive phrase "accurately describes securities brokerage." *Schwab*, 468 U.S. at ——, 104 S.Ct. at 3011 n. 20. It permits banks, acting as agents, to "arrange[ ] the purchase and sale of securities as an accommodation to their customers." *Id.* at ——, 104 S.Ct. at 3008. Thus, in *Schwab*, the Supreme Court upheld a Board decision permitting a bank holding company to acquire a non-banking affiliate engaged in retail securities brokerage, and this Circuit has ruled that national banks may purchase or establish discount securities brokerage subsidiaries. *Securities Industry Ass'n v. Comptroller of the Currency*, 577 F.Supp. 252 (D.D.C.1983), *aff'd per curiam*, 758 F.2d 739 (D.C.Cir.1985). Retail brokerage activities by banks do not raise the specter of those subtle hazards that the Glass-Steagall Act is designed to prevent: the profits of one selling in the retail or secondary market turn on the volume of shares sold, not on the purchase or sale of a particular security; the broker-bank has no "salesman's stake" in the securities it trades, and it cannot increase its profitability by extending credit to issuers of particular securities, nor by improperly favoring particular securities in the management of depositors' assets. *Schwab*, 468 U.S. at ——, 104 S.Ct. at 3011. Banks had engaged in retail brokerage sales prior to passage of the Act, and Congress, apparently convinced that the evils associated with investment-banking activities did not inhere in such activities, drafted section 16 to permit banks "to purchase and sell investment securities for their cus-

tomers to the same extent as heretofore." S.Rep. No. 77, 73d Cong., 1st Sess. 16 (1933) (quoted in *Schwab*, 468 U.S. at ——, 104 S.Ct. at 3008 n. 13).

Bankers Trust's placement of commercial paper is of a wholly different character. The bank does not sell in the secondary market as a broker, but assists in the initial flotation of securities in the primary market. It most definitely has a "salesman's stake" in the securities it sells—it earns its fee based on its success in placing a given issuer's paper, and indeed, its ability to attract new customer/issuers depends on how successful it is in marketing its customers' securities. Unlike the typical broker, Bankers Trust is not indifferent to the identity of the securities it sells; on the contrary, the profitability of its placement services hinges on "the purchase or sale of *particular* securities." *Schwab*, 468 U.S. at ——, 104 S.Ct. at 3011 (emphasis supplied). The bank is therefore inevitably cast in the role of promoter for specific securities, and precisely those promotional evils that Congress sought to root out of the commercial banking world are present in its activities.

The very history of this litigation, in fact, serves to illustrate the point. From 1978 until, presumably, December 1984, when the Board directed Bankers Trust to discontinue the practice, the bank extended credit to issuers in order to enhance the marketability of its commercial paper.[5] In *Schwab*, by contrast, the Supreme Court found that promotional pressures did not inhere in retail brokerage services because a bank "*cannot* increase [its] profitability by ... extend[ing] credit to issuers of particular securities." *Id.* at ——, 104 S.Ct. at 3011 (emphasis supplied). Obviously, Bankers Trust can, and for six years did, increase the profitability of its placement services through various credit extensions to issuers. Thus, while retail brokerage services lack certain promotional pressures as a

---

5. *See e.g., Moody's Commercial Paper Record* (October 1985) (explaining that Prime-1 rating for Renault Industrias Mexicana S.A. "is based solely on the support provided by a letter of credit issued by Bankers Trust" and "does not necessary reflect the credit worthiness of the issuer in any other issue ...").

matter of simple economics—*i.e.* because there is no financial incentive to distort lending practices—the Board had to suggest a number of regulatory guidelines in its June 4, 1985 Statement in order to curb those pressures that are undeniably present in Bankers Trust's activities. Accordingly, the Board assumed that if the bank advances funds or credit to an issuer, it will do so under different terms, at different times and for different purposes than if the bank meant to support a specific issue of commercial paper; that the bank will keep adequate records to demonstrate the independence of loans from commercial paper issues; and that the bank will monitor loans to issuers to make certain they are not used to cover unsold portions of any issue. June 4, 1985 Statement at 13. It is readily apparent, however, that these safeguards are not and cannot be self-enforcing; indeed, in its November 12, 1985 letter to the Court, the Board admits that an investigation into the bank's credit and lending practices is necessary to determine, nearly one year after its December 1984 letter, if Bankers Trust is extending credit to commercial paper issuers. Such an investigation is a tacit concession that promotional pressures absent from retail brokering arise naturally in sales activities such as Bankers Trust's.

In light of the concerns that prompted passage of the Glass-Steagall Act, the statute's broad prohibitions, the rather limited exception created by section 16, and the promotional pressures that necessarily inhere in Bankers Trust's sales activities, the Board's assertion that there is nothing in the Act's legislative history "indicating that secondary market brokerage activities were the *only* functions intended to be authorized [by section 16] or that the statutory terms should not be read literally," June 4, 1985 Statement at 19 (emphasis in original), rings more than a little hollow.

By looking to see only whether the bank's sales activities fit within the literal terms of the Act, and ignoring the structure and spirit of the law, the Board has, as plaintiff suggests, turned the statute on its head. What little legislative history there is concerning the permissive phrase of section 16 indicates that Congress intended to allow banks to continue the traditional retail brokerage services they had provided prior to passage of the Act. Yet the Board finds in this narrow exception authorization for sales activities of a completely different nature, apparently unheard of in 1933,[6] and fraught with the very promotional pressures Congress found so injurious to commercial banking.

### 3. *The Board's Analysis of the "Subtle Hazards"*

Perhaps recognizing the unpersuasiveness of its legislative history analysis, the Board elsewhere in its ruling examines the "subtle hazards" that Congress sought to eliminate by passing the Act, and finds that they are not likely to arise when banks sell commercial paper as the agents of issuers. The Board notes, therefore, that while a misuse or distortion of the bank's credit operations "is of particular concern", June 4, 1985 Statement at 39, it concludes that impairment of the bank's objectivity is "not significant" because the bank will take adequate steps to assure that its credit facilities are not improperly used, and because the financial gains from the bank's sales activities are too small in relation to its lending operations to lead the Board to believe that the former will influence the latter. *Id.* at 40. Similarly, the Board does not envisage significant damage to the public's confidence in commercial banks as a result of placement activities such as Bankers Trust's. This is so, in the Board's view, because the investing and depositing public will be fully apprised of the bank's activi-

---

**6.** In *SIA,* the Court noted that the history of commercial bank involvement with commercial paper prior to the Act's passage is not well-documented, but that to the extent banks did participate, they did so as discounters rather than dealers. 468 U.S. at ——, 104 S.Ct. at 2992.

The commercial-banking industry's failure to deal in commercial paper since the Act was passed, the Court observed, suggests that banks understood such activity to be prohibited by the statute. *Id.*

ties and the bank's loans will be independent of its sales operations. Moreover, because the bank sells paper to only a limited number of institutions, it is likely that the investors will amount to only a small fraction of the bank's depositors, and therefore even if they withdraw funds following a loss on commercial paper "the loss of business would not likely have an effect on the bank's safety or soundness." *Id.* at 42. In addition, the sophisticated investors that Bankers Trust sells to are likely, the Board believes, to view any loss on the commercial paper as at least partly their own fault. *Id.* at 43. Finally, the Board anticipates that the bank's role as disinterested financial adviser to its depositors will not be compromised by its sales operations, and similarly, that the bank is unlikely to pressure its corporate clients into using its placement services. The bank does not purchase commercial paper for its trust department, and, in the Board's view, the promotional incentives inherent in the bank's sales activities are "not significant" and thus unlikely "to subject the bank to this kind of conflict of interest." *Id.* at 46.

The Board's evaluation of the "subtle hazards" issues is flawed in several key respects. To begin with, the Board assumes that the "pecuniary stake" identified by the Supreme Court in *SIA* as the source of impermissible promotional pressures was "undoubtedly linked" to the bank's investment of its own funds in the commercial paper it sold. *Id.* at 35. The fact that Bankers Trust may no longer purchase the paper through loans or credit extensions,

the Board believes, eliminates this pecuniary stake altogether. While it is true that some of the congressional concerns discussed by the Supreme Court involved the bank's actual purchase of securities, such activities are hardly the exclusive source of promotional incentives. As noted above, Bankers Trust, as a seller in the primary market, is of necessity a promoter of specific securities. The Board concedes that the commercial paper market is "highly competitive", *id.* at 36, and that Bankers Trust's placement services are "designed primarily to maintain the bank's relationship with its best commercial lending customers, which in the recent past have increasingly sought to satisfy their short-term funding needs in the commercial paper market, rather than through loans from the bank." *Id.* at 37. It is obvious, then, that whether or not the bank purchases the commercial paper, it has a very significant "salesman's stake" in the paper it sells: in order to maintain its relationship with its most important commercial customers, the bank must place securities in a highly competitive market. The promotional pressures in such a situation are self-evident. In the face of these facts, the Board's conclusion that "the promotional incentive inherent in the [bank's] commercial paper activity is not significant," June 4, 1985 Statement at 46, is simply untenable.[7]

In addition, the Board's analysis is premised on the mistaken supposition that Congress sought only to eliminate "likely" haz-

7. The Board, in its ruling, and defendants in their submissions to this Court, make much of the fact that in *Schwab,* the Supreme Court stated in a footnote that "[a]ll these 'subtle hazards' are attributable to the promotional pressures that arise from ... purchas[ing] and sell[ing] particular investments *on their own account,*" 468 U.S. at ——, 104 S.Ct. at 3011 n. 23 (emphasis supplied). Defendants read this statement as a determination by the Supreme Court that underwriting alone gives rise to the hazards Congress sought to forestall. Such a reading, however, is unwarranted. To begin with, in *Schwab* the Supreme Court did not have before it activities such as Bankers Trust's here, and thus had no reason to consider the hazards that might arise when banks sell securi-

ties in the primary market without actually purchasing them. Moreover, the Court's textual analysis in *Schwab* does not suggest that underwriting is the *exclusive* source of deleterious promotional pressures. As discussed previously, the Court in *Schwab* identified a number of promotional hazards that were absent from Schwab's activities that are clearly present here. Thus, unlike Schwab, Bankers Trust's profits do depend on the purchase or sale of *particular* securities; and Bankers Trust *could* enhance the profitability of its services by extending credit to issuers of particular securities, *see* note 5 *supra* and accompanying text, or by favoring particular securities in the management of depositors' assets. *See Schwab,* 468 U.S. at ——, 104 S.Ct. at 3011.

ards or conflicts of interests. The Board acknowledges, for example, that personnel in the bank's credit department will in all likelihood be aware of the bank's role in placing a borrower's paper, thereby recognizing a potential conflict between the bank's role as lender and promoter. Nevertheless, it dismisses this conflict as unlikely. June 4, 1985 Statement at 39–40. Similarly, the Board recognizes that the bank's reputation could be harmed if the issuer of the paper were to default, but concludes that the damage would not be significant. *Id.* at 41–42. In like manner, the Board disposes of several other congressional concerns such as the possible lack of disinterested financial advice to depositors, or the danger that companies might issue paper to raise money in order to repay outstanding loans to the bank. In each case, the Board concedes that such dangers are possible but ultimately unimportant because, in the Board's view, they are unlikely. The Board's assessment of these likelihoods, however, whether accurate or not, simply misses the mark. As the Supreme Court made abundantly clear in *SIA*, Congress drafted the law to eliminate *potential* conflicts. of interest, not simply those that were especially likely to occur. Congress, the Supreme Court noted, was concerned "that a bank's 'salesman interest' in an offering *'might* impair its ability to function as an impartial source of credit,'" 468 U.S. at ——, 104 S.Ct. at 2989 (quoting *Camp,* 401 U.S. at 631, 91 S.Ct. at 1099) (emphasis supplied), and that banks *"might* use their relationships with depositors to facilitate distribution of securities in which the bank has an interest." *Id.* at ——, 104 S.Ct. at 2989–90 (emphasis supplied). In *SIA*, the Board argued that these congressional concerns were not implicated by the bank's activities because of the extremely low rate of default on prime quality commercial paper—*i.e.* that the hazards identified by Congress were not *likely* to arise. The Supreme Court rejected this actuarial analysis in no uncertain terms, stating that "the Act's underwriting prohibition displays no appreciation for the features of a particular issue; the Act just

prohibits commercial banks from underwriting any of them." *Id.* at ——, 104 S.Ct. at 2990. Indeed, the Court noted that the law's prohibitions "reflect[ ] Congress' conclusion that the *mere existence* of a securities operation, *'no matter how carefully and conservatively run,* is inconsistent with the best interests' of the bank as a whole." *Id.* at ——, 104 S.Ct. at 2990–91 (quoting remarks of Sen. Bulkley, 75 Cong. Rec. 9913 (1932) (emphasis supplied)). Notwithstanding these unequivocal pronouncements, the Board has once again undertaken an *ad hoc* analysis of probabilities and likelihoods. Neither the Act, nor the Supreme Court's explication of the Act, grant the Board a mandate to weigh the likelihood of a given hazard in light of the concerns that prompted passage of the Act. On the contrary, the Act is premised on a recognition of the "imperfection of human nature," and was designed to eliminate all potential conflicts of interest or other hazards so that bankers might not be "led into temptation," no matter how subtle or imperceptible those temptations might be. 75 Cong.Rec. 9912 (remarks of Sen. Bulkley). Having identified such potential hazards in Bankers Trust's sales activities, the Board was obliged to invalidate those activities.

■ In sum, the Court finds that Bankers Trust's sales activities do not fit within the narrow authorization provided by section 16. The bank's flotation of securities in the primary market is replete with precisely those pernicious promotional pressures that Congress sought to eliminate from the commercial banking industry. The Board's attempt to shoehorn such sales activity into section 16's permissive phrase, by regulating the most immediate promotional incentives and dismissing the more subtle as unlikely or insignificant, is inconsistent with Congress' desire to separate as completely as possible commercial and investment banking and must therefore be invalidated.

### B. *Distributing or Underwriting Securities*

The Board, having concluded that Bankers Trust's placement of commercial paper

constituted authorized "selling" of securities within the meaning of section 16, next analyzed those activities to determine whether the bank was "distributing" or "underwriting" securities for purposes of section 21, which prohibits banks from engaging in such activities. Unlike its ban on "selling," section 21's prohibition on "distributing" or "underwriting" securities is total, because the Act does not provide the narrow exceptions to these statutory terms that section 16 creates for the term "selling." While the Board conceded that Bankers Trust's placement activities are comprehended by the plain meaning of the terms "distributing" and "underwriting," it eschewed the statutory literalism it found so compelling in interpreting section 16's permissive phrase, and instead read the distribution and underwriting prohibitions as applying only to public offerings. In so ruling, the Board relied by way of analogy on the federal securities laws, which exempt certain non-public offerings from registration requirements. Having thus imported exceptions from the securities laws not found in the Glass-Steagall Act itself, the Board determined that Bankers Trust's sales were not directed at the general public, and therefore did not run afoul of the underwriting and distribution prohibitions. Plaintiff strenuously objects to both the Board's analysis and its conclusions.[8]

### 1. *Underwriting*

■ As the Board explained in its ruling, underwriting typically takes one of two forms. In a "firm commitment" underwriting, a person purchases securities from an issuer and then resells them, thereby assuming the risks of fluctuation in the value of the securities. In a "best efforts" underwriting, a person offers securities to third parties as agent for the issuer. 1 L. Loss, *Securities Regulation* 163–72 (2d ed. 1961). As Bankers Trust no longer purchases, either directly or through extensions of backup credit, the securities it sells (an assumption which, as noted previously, this Court accepts for present purposes) the bank is not engaged in "firm commitment" underwriting. Plaintiff contends, however, that because the bank sells commercial paper as the agent of issuers, and receives a commission for its promotional efforts directly related to its success in placing the paper, it is clearly engaged in "best efforts" underwriting. The Board does not dispute that "best efforts" distribution constitutes underwriting under the federal securities laws, June 4, 1985 Statement at 23 n. 23,[9] but maintains that "[t]he terms 'underwriting' and 'distributing,' as described by the Supreme Court in the *Schwab* decision and as defined in the Securities Act of 1933, typically refer to the process by which securities are offered to the public." *Id.* at 21.

It is true, as the Board claims, that the term "underwriting" commonly refers to the distribution of securities to the public. Thus, in *Schwab,* the Supreme Court noted that "[i]n the typical distribution of securities, an underwriter purchases securities from an issuer.... [and distributes] ... these securities to the public." 468 U.S. at ——, 104 S.Ct. at 3010 n. 17. In a "best efforts" underwriting, the Supreme Court observed, "large blocks of specific issues of securities are offered to the public by the investment banker acting as agent for the

---

**8.** The Court's determination that Bankers Trust's activities do not fall within section 16's permissive phrase, and are therefore barred by section 21's ban on the "selling" of securities, is sufficient to dispose of this case. Given the prior history of this litigation, however, with its series of reversals, the fact that plaintiff's challenge to the bank's practices is quickly approaching its seventh year, and the importance of this matter to the nation's financial markets generally, prudence and justice dictate that the Court address the Board's rulings on the distribution and underwriting issues.

**9.** In *Schwab,* the Supreme Court noted that "best efforts" distribution is not technically an underwriting, but did not reach the question of whether such distribution constitutes underwriting for purposes of the Glass-Steagall Act, since such activity was not before the Court. 468 U.S. at ——, 104 S.Ct. at 3010 n. 17. In its ruling, the Board acknowledged, however, that it is well-settled that "best efforts" distribution is underwriting for purposes of the federal securities laws.

issuer." *Id.* *See also* 1 L. Loss, *Securities Regulation* 164 (2d ed. 1961) (in "firm commitment" underwriting, issuer sells to underwriter, who sells to dealers, who in turn sell to public); Securities Act Rule 144, 17 C.F.R. § 230.144 (preliminary note) (underwriter includes investment banker who arranges for public sale of issuer's securities, as well as nonprofessionals who act as link in chain through which securities brought to public). Noting that in *SIA* the Supreme Court looked to the federal securities laws to determine the meaning of the phrase "notes, or other securities" in the Glass-Steagall Act, the Board sees "no convincing reason why this same principle should not apply in construing the terms underwriting and distributing in sections 16 and 21." Defendants' Motion for Summary Judgment at 26.

The difficulty with the Board's argument is that while both statutes were designed to prevent the abuses that precipitated the Great Depression, the two attack different problems and as a result have differing objectives. The federal securities laws were enacted "to prevent fraud and to protect the interests of *investors.*" *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975) (emphasis supplied). Thus, the public or private nature of a securities offering is of crucial importance under the federal securities laws, since a private distribution does not implicate one of the securities laws' core concerns: protecting the relatively unsophisticated, nonprofessional, *public* investor. The Glass-Steagall Act, on the other hand, was designed to preserve the integrity of the commercial banking industry by eliminating the potential conflicts of interest that arise when banks act as promoters of specific securities. Those conflicts of interest arise regardless of whether the bank engages in a best efforts underwriting campaign aimed at the general public, or sells only to large institutional investors; the promotional pressures which inhere in such activities are in no way diminished by the fact that the bank places commercial paper with the financially sophisticated.[10] The Supreme Court recognized as much in *SIA,* when it rejected the Board's earlier argument that commercial paper is not a note or other security because it is sold only to sophisticated investors. The Court noted that

> the Act leaves little room for such an ad hoc analysis. In its prohibition on commercial-bank underwriting, the Act admits of no exception according to the particular investment expertise of the customer. The Act's prohibition on underwriting is a *flat prohibition that applies to sales to both the knowledgeable and the naive.*

468 U.S. at ——, 104 S.Ct. at 2991 (emphasis supplied).[11]

---

**10.** Indeed, to the extent that the sophistication of the purchaser is relevant at all under the Glass-Steagall Act, it would appear that sales to financially astute investors in what the Board concedes is a highly competitive market would increase the promotional pressures on the bank. Such investors purchase on the basis of thorough financial analysis rather than advertising slogans, and would therefore be more likely to purchase securities that are backed by the bank's own credit, *see* note 5 *supra,* thereby increasing the bank's economic incentives to enhance the marketability of specific issues through distortions of its credit practices, however subtle or seemingly innocuous.

**11.** In its ruling, the Board dismissed the importance of this observation by the Supreme Court by noting that, had the Court determined that all placement activities involving a limited number of investors were barred by the Act, "it would have been unnecessary for the Court to remand the case for a ruling on the 'underwriting' issue." June 4, 1985 Statement at 27. Such an observation, however, is hardly an adequate substitute for a principled analysis of the public/private distinction which the Board draws yet fails to justify in light of the Act's concerns. Indeed, were the Board's logic accepted, Bankers Trust's prior practice of extending back-up credit to issuers could also be upheld, since the Supreme Court did not invalidate such practices outright, but instead remanded the case. The Board obviously found the Court's statements concerning the bank's credit practices controlling and advised the bank to discontinue them. It offers no reasoned explanation as to why those Supreme Court observations are to be given the weight of law, while the Court's statements concerning the nature of the purchasers can be disregarded as inconsequential dicta.

In short, the federal securities laws do not provide the compelling analogy the Board finds in them. Bankers Trust's sales activities are a form of best efforts underwriting aimed at large institutional investors, and accordingly fall within section 21's prohibition on underwriting. The Board's attempt to narrow the reach of this statutory language by importing limitations found in the securities laws is simply unpersuasive in light of the differing objectives of the Glass-Steagall Act, and the fact that the hazards which prompted passage of that Act are just as likely to occur in sales to private institutions as in sales to the general public.

### 2. *Distribution*

The Board's conclusion that Bankers Trust has not engaged in prohibited distribution of securities is equally flawed. Indeed, its interpretation of this particular statutory term highlights the inconsistency of its analysis. The Board states that the term "distribution" has been "traditionally ... viewed ... as synonymous with a public offering of securities," June 4, 1985 Statement at 24 (footnote omitted), and notes that "section 4(2) of the Securities Act (15 U.S.C. § 77d(2)) exempts from the registration and prospectus delivery requirements of the [securities laws] those transactions that do not involve a public offering." *Id.* The Board then goes on to find that Bankers Trust does not engage in a public offering of commercial paper "in the ordinary sense of the term," and therefore does not distribute securities for purposes of the Glass-Steagall Act.

In so ruling, however, the Board fails to account for a significant difference between the two statutes: the Securities Act contains an express exemption for securities distribution through a non-public offering, while the Glass-Steagall Act provides no similar qualification. This discrepancy is significant in at least two respects. First, it indicates that, contrary to what the Board might believe, the term "distribution" in the Securities Act does not mean only "public offerings"; if that were true, then the exemption for non-public offerings would be entirely superfluous, since by definition such offerings would not be "distributions," and thus would not be covered by the statute in the first place.[12] Second, the Securities Act exemption demonstrates that Congress was aware of the sometimes different nature of public and non-public distributions of securities, and that when it deemed those differences relevant to a given statute's purpose, it drew appropriate distinctions between the two types of offerings. The Glass-Steagall Act contains no such distinctions, however, compelling the conclusion that the statute prohibits banks from *all* distributions, be they public or non-public. In light of these different statutory structures, the Board's attempt to create an exemption for nonpublic distributions where none was provided nor apparently intended, simply cannot be upheld.

The Board's efforts to engraft the Securities Act exemption onto the Glass-Steagall Act fail for yet another reason. Having limited the unqualified terms of the Glass-Steagall Act by analogizing to the securities laws, the Board immediately encounters difficulty because Bankers Trust's activities do not satisfy all the requirements of the Securities and Exchange Commission's ("SEC's") Regulation D, which sets out the conditions that must be met in order for an offering to qualify for the private placement exemption of the Securities Act.[13] Forced to back away from its "compelling analogy" and to acknowl-

---

**12.** The Securities and Exchange Commission ("SEC"), the agency charged with primary responsibility for interpreting and enforcing the securities laws, has rejected the view that no distribution occurs simply because an offering is exempt from registration under the Securities Act. *See* Securities Exchange Act Release No. 34–22205, 50 Fed.Reg. 28385, 28392 n. 58 (July 12, 1985).

**13.** The bank advertises its services, thereby violating SEC Rule 502(c) which prohibits general solicitation. 17 C.F.R. § 230.502(c). The bank also places no restrictions on the resale of the paper it sells, violating Rule 502(d). 17 C.F.R. § 230.502(d).

edge that the Glass-Steagall Act and securities laws were designed to accomplish different objectives, the Board concedes that the interpretation of terms used in the Securities Act should not be controlling for all purposes of the Glass-Steagall Act. June 4, 1984 Statement at 24–25. Having recognized the different purposes of the two statutes, however, the Board does not then ask whether the public/non-public distinction which it finds in the securities laws is relevant to the Glass Steagall Act. Instead, it dismisses those provisions of Regulation D that Bankers Trust fails to satisfy as not "germane to the core concerns of the ... Act." *Id.* at 31. This pick-and-choose approach to statutory construction is insupportable. The Board cannot have it both ways, drawing on those provisions of the securities laws that support its decision and rejecting other, less favorable features of those laws as irrelevant. Had the Board looked to see whether the non-public exemption was "germane" to the Glass-Steagall Act, it would have found, as the Court noted previously, that the promotional pressures Congress sought to eliminate are equally present in non-public as well as public distributions. The limitations the Board attempts to impose on the terms of the statute are not only not germane to the Act, they are inconsistent with its core concerns. The Board, however, only inquired into the relevance of those provisions that ran counter to its conclusions, thus undermining the validity of its decision.[14]

Moreover, the Board once again looked to the nature of the purchasers in order to determine whether Bankers Trust is engaged in impermissible distribution of securities. As noted above, the Supreme Court has rejected this consideration as irrelevant to the Glass-Steagall Act, which bars banks from all distributions, and draws no distinc-

tions based on the investment expertise of those to whom the securities are offered. *SIA*, 468 U.S. at ——, 104 S.Ct. at 2991. The rejection is perfectly consistent with the Act's purposes, for as discussed previously, the promotional incentives that inhere in Bankers Trust's sales are as great, if not greater, than the pressures that would arise if the banks were to sell securities to the general public. *See* note 10, *supra* and accompanying text; *see also A.G. Becker, Inc. v. Board of Governors,* 693 F.2d 136, 154 (D.C.Cir.1982) (Robb, J., dissenting), *rev'd,* 468 U.S. 137, 104 S.Ct. 2979, 82 L.Ed.2d 107 (1984) (bank depositors who are financially able to purchase commercial paper in large denominations likely to be among bank's most important clientele; loss of their goodwill due to losses on paper sold by bank could be detrimental to bank's operations). The Board's reliance on this feature of the bank's activities, therefore, provides no support for its conclusion that Bankers Trust does not engage in distributing securities.

Finally, the Board's determination that the bank's activities do not constitute distribution of securities within the meaning of the Glass-Steagall Act reveals again the regulatory approach the Board has adopted. Commenters before the Board argued that because of the short-term maturity of the paper the bank sells, Bankers Trust will be forced to assist in "rolling over" the paper, and therefore its sales efforts cannot realistically be viewed as one-time private placements of securities. In response, the Board stated that the frequent nature of these activities, standing alone, does not necessarily convert a private offering into a public one, and went on to add that "if the bank's activities become directed toward marketing securities to an ever-broadening class of customers, the

---

**14.** In addition to illustrating the inconsistency of its analysis, the Board's dismissal of certain portions of Regulation D raises serious questions concerning the respective roles of the Board and the SEC in regulating the securities industry. Congress gave the Board no regulatory authority under the Glass-Steagall Act, *SIA,* 468 U.S. at ——, 104 S.Ct. at 2989, and extensive

rule-making authority to the SEC under the Securities Act of 1933. The Board in its ruling not only authorizes bank securities operations, it also appropriates the SEC's authority to define what constitutes a "private placement" of securities. It is extremely doubtful that Congress could have envisioned any such regulatory reversal.

character of the offering could eventually change from nonpublic to public and the provisions of the Act could then apply." June 4, 1985 Statement at 32. Not surprisingly, the Board offers no suggestion as to how it will determine if and when the bank's marketing efforts have crossed the magic threshold from private to public offerings. Whatever criteria the Board will apply, they certainly will not derive from the statute itself, since the Act draws no distinction between public and private distributions. The Board therefore will have to draft guidelines or rules to demarcate the boundaries between permissible and impermissible offerings of securities, and in addition, will be forced to monitor the sales activities of banks to assure adherence to such guidelines.

The Supreme Court, however, has made clear that "[a]lthough ... guidelines may be a sufficient regulatory response to ... potential problems, Congress rejected a regulatory approach when it drafted the statute, and it has adhered to that rejection ever since." *SIA*, 468 U.S. at ——, 104 S.Ct. at 2988. In addition, Congress has consistently "continued to withhold from the [Board] the authority to issue regulations concerning 'securities activities of National Banks under the Act.'" *SIA*, 468 U.S. at ——, 104 S.Ct. at 2989 (quoting Depository Institutions Deregulation and Monetary Control Act of 1980, § 708, 94 Stat. 188, 12 U.S.C. § 93a). Once again the Board has run afoul of these unequivocal admonitions. While the Board insists that it is not regulating banks but simply interpreting the statutory terms, its interpretation raises a host of difficulties that can only be addressed through guidelines or regulations. Congress designed the Act as a series of flat prohibitions, obviating the need for regulation. That the Board's ruling converts these clear statutory commands into sliding scale prohibitions necessitating guidelines and agency oversight simply underscores the invalidity of the Board's decision.

In sum, the Court concludes that Bankers Trust is engaged in underwriting and distributing securities for purposes of the Glass-Steagall Act. The Board's attempt to superimpose the private placement exemption of the securities laws onto the Glass-Steagall Act is simply inconsistent with the Act's purpose, as the subtle hazards that Congress intended to forestall are equally present in public and private offerings of securities. The Board's ruling on this issue must therefore also be invalidated.

### III. *Conclusion*

The Glass-Steagall Act was enacted over 50 years ago, in response to a financial collapse the likes of which the nation had never before witnessed, nor, fortunately, has it experienced since. It may well be that as the memory of that event recedes from the national consciousness, the concerns which prompted passage of the Act in those stark times appear in retrospect to be less pressing or important than the 1933 Congress envisioned, and the prohibitions Congress drafted may seem today to be unnecessarily restrictive. The commercial banking industry apparently believes so, and has been lobbying Congress to change the law for some time now. To date, the nation's elected representatives have not seen fit to do so. In the face of this congressional inaction, it is not for this Court or the Board to alter the law. Yet, the Board would effectively reform the Act under the guise of interpreting it, by attempting to regulate and minimize the very promotional hazards that Congress sought to permanently eliminate from commercial banking. Indeed, Federal Reserve Board Chairman Paul Volcker recognized as much in his concurring statement, in which he wrote that

a more straightforward way of proceeding would be to obtain legislative authorization for banks to deal in and act as agents for the distribution of commercial paper. Congressional action is needed in order to provide a firm foundation of specifically applicable new law for the conduct of this activity, as well as to provide the Board with full authority to establish the necessary prudential framework.

June 4, 1985 Statement, Concurring Statement of Chairman Volcker at 3. Congress has not yet provided such legislation, nor granted the Board the authority it attempts to assert through its ruling. Until such time as Congress acts, the Board may not give its blessings to Bankers Trust's activities, nor regulate those activities in an effort to minimize the hazards they present.

For all the foregoing reasons, therefore, plaintiff's Motion for Further Summary Judgment be and it hereby is granted. The Federal Reserve Board's June 4, 1985 Statement, permitting banks to sell third-party commercial paper, be and it hereby is invalidated as inconsistent with the Glass-Steagall Act.

SO ORDERED.