# SECURITIES INDUSTRY ASSOCIATION v. BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM ET AL.

No. 83–614.   Argued April 24, 1984—Decided June 28, 1984

POWELL, J., delivered the opinion for a unanimous Court.

*James B. Weidner* argued the cause for petitioner. With him on the briefs were *John M. Liftin, David A. Schulz, William J. Fitzpatrick,* and *Donald J. Crawford.*

*Carter G. Phillips* argued the cause for respondents. With him on the brief for the federal respondents were *Solicitor General Lee* and *Deputy Solicitor General Claiborne. Arnold M. Lerman, Andrea Timko Sallet,* and *H. Helmut Loring* filed a brief for respondent BankAmerica Corp.*

JUSTICE POWELL delivered the opinion of the Court.

This case presents the question whether the Federal Reserve Board has statutory authority under § 4(c)(8) of the Bank Holding Company Act of 1956, 12 U. S. C. § 1843(c)(8), to authorize a bank holding company to acquire a nonbanking affiliate engaged principally in retail securities brokerage.

---

*Briefs of *amici curiae* urging affirmance were filed for the American Bankers Association et al. by *Robert S. Rifkind;* and for the Legal Foundation of America by *David Crump.*

## I

BankAmerica Corp. (BAC) is a bank holding company within the meaning of the Bank Holding Company Act.[1] In March 1982, BAC applied to the Federal Reserve Board (Board) for approval under § 4(c)(8) of the Act to acquire 100 percent of the voting shares of The Charles Schwab Corp., a company that engages through its wholly owned subsidiary, Charles Schwab & Co. (Schwab), in retail discount brokerage.[2] The Board ordered that formal public hearings be held before an Administrative Law Judge (ALJ) to consider the application. The Securities Industry Association (SIA), a national trade association of securities brokers, and petitioner here, opposed BAC's application and participated in those hearings.[3] After six days of hearings, the ALJ recommended that BAC's application be approved. After reviewing the evidentiary record, the Board adopted, with modifications, the findings and conclusions of the ALJ and authorized BAC to acquire Schwab. 69 Fed. Res. Bull. 105 (1983). SIA petitioned the Court of Appeals for the Second Circuit for judicial review under 12 U. S. C. § 1848.

The Court of Appeals held that the Board had acted within its statutory authority in authorizing BAC's acquisition of Schwab under § 4(c)(8) of the BHC Act. The court accordingly affirmed the Board's order. 716 F. 2d 92 (1983). We granted SIA's petition for certiorari, 465 U. S. 1004 (1984), and now affirm.

---

[1] BAC operates one subsidiary bank, Bank of America. That bank is a member of the Federal Reserve System, and the parties inform us that it is the largest commercial bank in the United States.

[2] Schwab is known as a "discount" broker because of the low commissions it charges. Schwab can afford to charge lower commissions than full-service brokerage firms because it does not provide investment advice or analysis, but merely executes the purchase and sell orders placed by its customers.

[3] In addition to BAC, the Justice Department participated in the hearing as a proponent of the proposed acquisition.

210

## II

Section 4 of the Bank Holding Company Act (BHC Act) prohibits the acquisition by bank holding companies of the voting shares of nonbanking entities unless the acquisition is specifically exempted. The principal exemption to that prohibition is found in § 4(c)(8). That provision authorizes bank holding companies, with prior Board approval, to engage in nonbanking activities that the Board determines are "so closely related to banking . . . as to be a proper incident thereto." 12 U. S. C. § 1843(c)(8).[4]

Application of the § 4(c)(8) exception requires the Board to make two separate determinations. First, the Board must determine whether the proposed activity is "closely related" to banking.[5] If it is, the Board may amend its regulations to

---

[4] Section 4(c)(8) provides that the general ban on the ownership by a bank holding company of shares in any company other than a bank shall not apply to:

"(8) shares of any company the activities of which the Board after due notice and opportunity for hearing has determined (by order or regulation) to be so closely related to banking or managing or controlling banks as to be a proper incident thereto . . . . In determining whether a particular activity is a proper incident to banking or managing or controlling banks the Board shall consider whether its performance by an affiliate of a holding company can reasonably be expected to produce benefits to the public, such as greater convenience, increased competition, or gains in efficiency, that outweigh possible adverse effects, such as undue concentration of resources, decreased or unfair competition, conflicts of interests, or unsound banking practices." 12 U. S. C. § 1843(c)(8).

[5] In making this determination, the Board generally has followed the guidelines announced in *National Courier Assn.* v. *Board of Governors,* 170 U. S. App. D. C. 301, 516 F. 2d 1229 (1975). That case held that an activity is "closely related" to banking within the meaning of § 4(c)(8) if any one of the following is demonstrated:

"1. Banks generally have in fact provided the proposed services.

"2. Banks generally provide services that are operationally or functionally so similar to the proposed services as to equip them particularly well to provide the proposed service.

include the activity as a permissible nonbanking activity.[6] Next, the Board must determine on a case-by-case basis whether allowing the applicant bank holding company to engage in the activity reasonably may be expected to produce public benefits that outweigh any potential adverse effects. H. R. Conf. Rep. No. 91-1747, pp. 16-18 (1970).[7]

## A

In this case, the Board held that the securities brokerage services offered by Schwab were "closely related" to banking within the meaning of § 4(c)(8). Relying on record evidence and its own banking expertise, the Board articulated the ways in which the brokerage activities provided by Schwab were similar to banking. The Board found that banks currently offer, as an accommodation to their customers, brokerage services that are virtually identical to the services

---

"3. Banks generally provide services that are so integrally related to the proposed services as to require their provision in a specialized form." *Id.*, at 313, 516 F. 2d, at 1237.

The Board has recognized, however, that the *National Courier* guidelines do not provide the exclusive basis for finding that an activity is "closely related" to banking, and has stated that it will consider "any . . . factor that an applicant may advance to demonstrate a reasonable or close connection or relationship of the activity to banking." 49 Fed. Reg. 806 (1984).

[6] See 12 CFR § 225 (1983) ("Regulation Y"). Section 225.4 of Regulation Y contains a list of those activities already determined by the Board to be "closely related" to banking.

[7] When a bank holding company applies for approval to engage in an activity already listed in Regulation Y, the application generally will be acted on by a Reserve Bank under delegated authority from the Board. 49 Fed. Reg. 815 (1984). In acting on the application, the Reserve Bank need determine only that the public benefits that are likely to result from the applicant's proposal will outweigh the possible adverse effects. If, as in this case, an application involves a currently unlisted activity, it must be considered by the Board itself. In that case, the Board must make both of the determinations described above before approving the application.

212

offered by Schwab. 69 Fed. Res. Bull., at 107.[8] Moreover, the Board cited a 1977 study by the Securities and Exchange Commission that found that

> "bank trust department trading desks, at least at the largest banks, perform the same functions, utilize the same execution techniques, employ personnel with the same general training and expertise, and use the same facilities . . . that brokers do." *Ibid.*

Finally, the Board concluded that the use by banks of "sophisticated techniques and resources" to execute purchase and sell orders for the account of their customers was sufficiently widespread to justify a finding that banks generally are equipped to offer the type of retail brokerage services provided by Schwab. *Id.,* at 108. On the basis of these findings, the Board held that a securities brokerage business that is "essentially confined to the purchase and sale of securities for the account of third parties, and without the provision of investment advice to the purchaser or seller" is "closely related" to banking within the meaning of § 4(c)(8) of the BHC Act. *Id.,* at 117.[9]

---

[8] The Board conceded that banks, unlike retail brokers, use an intervening broker to execute orders for the purchase and sale of securities traded on an exchange. The Board found, however, that banks often execute purchase and sell orders for securities that are not traded on an exchange without an intervening broker. To this extent they perform the same services as a retail broker. 69 Fed. Res. Bull., at 107.

[9] The Board, after notice and comment, subsequently amended Regulation Y to include the securities brokerage business at issue here in the list of permissible nonbanking activities. See 48 Fed. Reg. 7746 (1983) (proposed amendment published for comment); 48 Fed. Reg. 37003 (1983) (final regulation amending 12 CFR § 225.4). The final amendment to Regulation Y added as a permissible nonbanking activity:

"(15) providing securities brokerage services, related securities credit activities pursuant to the Board's Regulation T (12 CFR Part 220), and incidental activities such as offering custodial services, individual retirement accounts, and cash management services, *provided* that the securities brokerage services are restricted to buying and selling securities solely as

## B

The Board next determined that the public benefits likely to result from BAC's acquisition of Schwab outweighed the possible adverse effects. Specifically, the Board identified as public benefits the increased competition and the increased convenience and efficiencies that the acquisition would bring to the retail brokerage business. *Id.*, at 109–110. As to possible adverse effects, the Board determined that the proposed acquisition would not result in the undue concentration of resources, decreased competition, or unfair competitive prices. *Id.*, at 110–114.

Finally, the Board concluded that BAC's acquisition of Schwab was not prohibited by the Glass-Steagall Act.[10] *Id.*, at 114–116. The Board observed that the proposed acquisition would make Schwab an affiliate of BAC's banking subsidiary and thus subject to the provisions of the Glass-Steagall Act. It held, however, that Schwab was "not engaged principally in any of the activities prohibited to member bank affiliates by the Glass-Steagall Act," and thus concluded that the acquisition was "consistent with the letter and spirit of that act." *Id.*, at 114.

SIA challenges the Board's order in this case on two grounds. First, it argues that the Board may not approve an activity as "closely related" to banking unless it finds that the activity will facilitate other banking operations. Second, it argues that § 20 of the Glass-Steagall Act, 12 U. S. C. § 377, prohibits a bank holding company from owning any entity that is engaged principally in retail securities brokerage and thus that the Board lacked statutory authority under § 4(c)(8) to approve BAC's acquisition of Schwab.[11]

---

agent for the account of customers and do not include securities underwriting or dealing or investment advice or research services." 48 Fed. Reg. 37006 (1983) (emphasis in original).

[10] The Glass-Steagall Act was enacted as part of the Banking Act of 1933.

[11] In proceedings before the Court of Appeals, SIA apparently challenged the Board's public benefit analysis as well. See 716 F. 2d 92, 103–104 (CA2 1983). SIA, however, has not advanced that argument here.

## III

### A

There is no express requirement in § 4(c)(8) that a proposed activity must facilitate other banking operations before it may be found to be "closely related" to banking. Indeed, the relevant statutory language does not specify any factors that the Board must consider in making that determination. The general nature of the statutory language, therefore, suggests that Congress vested the Board with considerable discretion to consider and weigh a variety of factors in determining whether an activity is "closely related" to banking. In this case, the Board concluded that Schwab's brokerage services were "closely related" to banking because it found that the services were "operationally and functionally very similar to the types of brokerage services that are generally provided by banks and that banking organizations are particularly well equipped to provide such services." 69 Fed. Res. Bull., at 107.[12] The Board acted well within its discretion in ruling on

---

[12] SIA argues that the legislative history of the 1970 amendment to § 4(c)(8) establishes that Congress expressly rejected a "functionally related" standard, and that the Board exceeded its statutory authority by relying on that standard here. This argument is without merit. In 1970, the initial versions of both the House and Senate bills changed the "closely related" test of § 4(c)(8) to a "functionally related" test. S. Rep. No. 91–1084, p. 25 (1970); H. R. Rep. No. 91–387, p. 1 (1969). The Conference Committee, however, retained the "closely related" language of the prior Act in the final version of the bill. H. R. Conf. Rep. No. 91–1747, p. 5 (1970). As we observed in *Board of Governors of Federal Reserve System* v. *Investment Company Institute*, 450 U. S. 46, 73 (1981), the significance of this legislative history is unclear. It is, however, clear that the 1970 amendment broadened rather than restricted the Board's discretion to determine whether nonbanking activities are significantly related to banking. See *id.*, at 72–76. Thus, there is no indication that Congress intended to preclude consideration by the Board of the functional relationship of nonbanking activities to banking in determining whether those activities may qualify for the § 4(c)(8) exemption.

Moreover, it is not clear that the Board in this case applied the "functionally related" test arguably rejected by Congress in 1970. The Board found

such factors. Moreover, the Board's factual findings are substantially supported by the record.

Banks long have arranged the purchase and sale of securities as an accommodation to their customers. Congress expressly endorsed this traditional banking service in 1933. Section 16 of the Glass-Steagall Act authorizes banks to continue the practice of "purchasing and selling . . . securities and stock without recourse, solely upon the order, and for the account of, customers, and in no case for [their] own account[s]." 12 U. S. C. § 24 Seventh.[13] The Board found that in substance the brokerage services that Schwab performs for its customers are not significantly different from those that banks, under the authority of § 16, have been performing for their own customers for years. See 69 Fed. Res. Bull., at 107–109. Moreover, the amendment to Regulation Y, added by the Board in 1983 to reflect its decision in this case, expressly limits the securities brokerage services in which a bank may engage "to buying and selling securities solely as agent for the account of customers" and does not authorize "securities underwriting or dealing or investment advice or research services." 48 Fed. Reg. 37006 (1983).[14]

Congress has committed to the Board the primary responsibility for administering the BHC Act. Accordingly, the Board's determination of what activities are "closely related" to banking within the meaning of § 4(c)(8) "is entitled to the

---

that Schwab's brokerage business was both "operationally and functionally very similar to" traditional banking services and that banks were well equipped to provide those services. 69 Fed. Res. Bull., at 107.

[13] See S. Rep. No. 77, 73d Cong., 1st Sess., 16 (1933) (explaining that § 16 was intended to permit banks "to purchase and sell investment securities for their customers to the same extent as heretofore").

[14] See n. 9, *supra*. Schwab also provides some incidental services to its customers such as margin lending, custodial accounts, and appropriate account maintenance. The Board also approved these as "closely related" to banking when offered incident to the approved brokerage services. See 69 Fed. Res. Bull., at 108–109. SIA has not challenged the Board's conclusions with respect to these incidental services.

greatest deference." *Board of Governors of Federal Reserve System* v. *Investment Company Institute,* 450 U. S. 46, 56 (1981) *(ICI).* In this case, the Board has articulated with commendable thoroughness the ways in which banking activities are similar to the brokerage activities at issue here. The standard the Board used to determine that Schwab's brokerage business is "closely related" to banking is reasonable and supported by a normal reading of the statutory language of § 4(c)(8). The factual findings to which this standard was applied are substantially supported by the record. The Court of Appeals, therefore, properly deferred to the Board's determination in this case.

## B

The Board expressly considered and rejected SIA's argument that BAC's acquisition of Schwab violates the Glass-Steagall Act. That Act comprises four sections of the Banking Act of 1933.[15] Only one of those four sections is applicable here. That provision, § 20, as set forth in 12 U. S. C. § 377, provides in relevant part:

> "[N]o member bank shall be affiliated in any manner described in subsection (b) of section 221a of this title with any corporation, association, business trust, or other similar organization *engaged principally in the issue, flotation, underwriting, public sale, or distribution* at wholesale or retail or through syndicate participation of stocks, bonds, debentures, notes, or other securities . . ." (emphasis added).

A bank holding company's subsidiaries are bank affiliates within the meaning of § 20. 12 U. S. C. § 221a(b). Section 20, therefore, prohibits BAC's proposed acquisition if Schwab is "engaged principally" in any of the activities listed therein.

---

[15] Those four sections are §§ 16, 20, 21, and 32, codified respectively at 12 U. S. C. §§ 24, 377, 378, and 78.

SIA concedes that Schwab is not engaged in the "issue, flotation, underwriting, . . . or distribution" of securities. It argues, however, that the term "public sale" of securities as used in § 20 applies to Schwab's brokerage business. The Board rejected this argument, holding that "Schwab is not engaged principally in any of the activities prohibited to member bank affiliates by the Glass-Steagall Act." 69 Fed. Res. Bull., at 114. The Board has broad power to regulate and supervise bank holding companies and banks that are members of the Federal Reserve System. In this respect, the Board has primary responsibility for implementing the Glass-Steagall Act, and we accord substantial deference to the Board's interpretation of that Act whenever its interpretation provides a reasonable construction of the statutory language and is consistent with legislative intent. *ICI, supra,* at 68; *Investment Company Institute* v. *Camp,* 401 U. S. 617, 626–627 (1971).[16]

"Public sale" is used in conjunction with the terms "issue," "flotation," "underwriting," and "distribution" of securities. None of these terms has any relevance to the brokerage business at issue in this case. Schwab does not engage in issuing or floating the sale of securities, and the terms "underwriting" and "distribution" traditionally apply to a function distinctly different from that of a securities broker.[17] An under-

---

[16] Such deference is appropriate where, as here, the Board expressly addressed the application of the Glass-Steagall Act to the proposed regulatory action and determined that the proposed action implicated none of the concerns that led to the enactment of that Act. See *ICI,* 450 U. S., at 68. In *Camp,* on the other hand, we gave less deference to regulatory action that was taken without any "expressly articulated position at the administrative level as to the meaning and impact of the provisions of [the Glass-Steagall Act]." 401 U. S., at 627. We held in *Camp* that agency action taken "without opinion or accompanying statement" was "hardly tantamount to an administrative interpretation" of the Glass-Steagall Act, and was not due the deference normally accorded such regulatory action. *Id.,* at 627–628.

[17] In the typical distribution of securities, an underwriter purchases securities from an issuer, frequently in association with other underwrit-

writer normally acts as principal whereas a broker executes orders for the purchase or sale of securities solely as agent.[18] Under the "familiar principle of statutory construction that words grouped in a list should be given related meaning," *Third National Bank* v. *Impac, Ltd.*, 432 U. S. 312, 322 (1977) (footnote omitted), the term "public sale" in § 20 should be read to refer to the underwriting activity described by the terms that surround it, and to exclude the type of retail brokerage business in which Schwab principally is engaged.

This reading of the statute is further supported by the Board's longstanding interpretation of identical language found in § 32 of the Glass-Steagall Act, 12 U. S. C. § 78. That section prohibits interlocking management or employment between banks and any entity "primarily engaged in the *issue, flotation, underwriting, public sale, or distribution,* at wholesale or retail, or through syndicate participation" of securities. 12 U. S. C. § 78 (emphasis added).[19] In

---

ers. The distribution of these securities to the public may be effected by the underwriters alone, or in conjunction with a group of dealers who also purchase and sell the particular issue of securities as principals. Underwriters also may distribute securities under a "best efforts" agreement pursuant to which large blocks of specific issues of securities are offered to the public by the investment banker as agent for the issuer. A "best efforts" distribution is not technically an underwriting. 1 L. Loss, Securities Regulations 172 (2d ed. 1961). Because Schwab's brokerage business involves none of these distribution plans, we need not consider whether a "best efforts" distribution is prohibited under § 20.

[18] Most securities firms engage in all aspects of the securities business, acting at various times as underwriters, dealers, or brokers. As underwriter and dealer, the firm buys and sells securities on its own account thereby assuming all risk of loss. As broker, the firm buys and sells securities as an agent for the account of customers. In these transactions, it is the customer, rather than the securities firm, who bears the risk of loss. Schwab is different from most securities firms in that it engages solely in the brokerage business and does not participate in underwriting or dealing in securities.

[19] Section 32 provides in relevant part:

"No officer, director, or employee of any corporation or unincorporated association, no partner or employee of any partnership, and no individual, primarily engaged in the issue, flotation, underwriting, public sale, or

January 1936, the Board interpreted the list of prohibited activities described in § 32 to exclude the kind of brokerage activities at issue here. Specifically, the Board ruled that

> "[a] broker who is engaged solely in executing orders for the purchase and sale of securities on behalf of others in the open market is not engaged in the business referred to in section 32." 22 Fed. Res. Bull. 51, n. 1 (1936).

Because §§ 32 and 20 contain identical language, were enacted for similar purposes, and are part of the same statute, the long-accepted interpretation of the term "public sale" to exclude brokerage services such as those offered by Schwab should apply as well to § 20.[20] The Board's interpretation of the disputed term is supported by the plain language of the statute. It is also entirely consistent with legislative intent.

The legislative history demonstrates that Congress enacted § 20 to prohibit the affiliation of commercial banks with entities that were engaged principally in "activities such as underwriting." *ICI*, 450 U. S., at 64; see *Camp, supra,* at 630–634. In 1933, Congress believed that the heavy involve-

---

distribution, at wholesale or retail, or through syndicated participation, of stocks, bonds, or other similar securities, shall serve the same time as an officer, director, or employee of any member bank . . . ." 12 U. S. C. § 78.

[20] SIA argues that the phrase in § 16 that allows banks to engage in "purchasing and selling . . . securities and stock, without recourse, solely upon the order, and for the account of, customers" is essentially equivalent to the term in § 20 that prohibits the "public sale" of securities. This argument is unpersuasive. There is no basis for assuming that the dissimilar phrases found in §§ 16 and 20 are coterminous. The permissive phrase found in § 16 accurately describes securities brokerage and clearly distinguishes that activity from the activities of "dealing in, underwriting and purchasing for its own account investment securities" that are prohibited elsewhere in that section. Section 20 also prohibits bank affiliates from engaging in these latter activities. The description of securities brokerage found in § 16, however, appears nowhere in § 20.

Moreover, § 16 applies only to banks, not to bank holding companies, and is not applicable here. Thus, we have no occasion to determine whether § 16 would permit banks to engage in brokerage activity on the behalf of the general public as well as for their own customers.

ment of commercial banks in underwriting and securities speculation had precipitated "the widespread bank closings that occurred during the Great Depression." *ICI, supra,* at 61. One of the most serious threats to sound commercial banking perceived by Congress was the existence of "bank affiliates" that "devote themselves in many cases to perilous underwriting operations, stock speculation, and maintaining a market for the banks' own stock often largely with the resources of the parent bank." S. Rep. No. 77, 73d Cong., 1st Sess., 10 (1933).[21]

Congressional concern over the underwriting activities of bank affiliates included both the fear that bank funds would be lost in speculative investments and the suspicion that the more "subtle hazards" associated with underwriting would encourage unsound banking practices. See *Camp,* 401 U. S., at 630.[22] None of the more "subtle hazards" of underwriting identified in *Camp* is implicated by the brokerage activities at issue here.[23] Because Schwab trades only as agent, its assets are not subject to the vagaries of the securities markets. Moreover, Schwab's profits depend solely on the volume of shares it trades and not on the purchase or sale of particular securities. Thus, BAC has no "salesman's stake" in the securities Schwab trades. It cannot increase

---

[21] See Hearings pursuant to S. 71 before a Subcommittee of the Senate Committee on Banking and Currency, 71st Cong., 3d Sess., 1052–1068 (1931).

[22] We held in that case:

"The legislative history of the Glass-Steagall Act shows that Congress also had in mind and repeatedly focused on the more subtle hazards that arise when a commercial bank goes beyond the business of acting as fiduciary or managing agent and enters the investment banking business either directly or by establishing an affiliate to hold and sell particular investments." 401 U. S., at 630.

[23] See *Camp,* 401 U. S., at 631–634 (identifying the "subtle hazards" of affiliation with underwriting firms). All these "subtle hazards" are attributable to the promotional pressures that arise from affiliation with entities that purchase and sell particular investments on their own account.

Schwab's profitability by having its bank affiliate extend credit to issuers of particular securities, nor by encouraging the bank affiliate improperly to favor particular securities in the management of depositors' assets. Finally, the fact that § 16 of the Glass-Steagall Act allows banks to engage directly in the kind of brokerage services at issue here, to accommodate its customers, suggests that the activity was not the sort that concerned Congress in its effort to secure the Nation's banks from the risks of the securities market.

In sum, we see no reason to disturb the Board's determination that "the business of purchasing or selling securities upon the unsolicited order of, and as agent for, a particular customer does not constitute the 'public sale' of securities for purposes of section 20." 69 Fed. Res. Bull., at 114. This interpretation of the Glass-Steagall Act is reasonable, consistent with the plain language of the statute and its legislative history, and deserves the deference normally accorded the Board's construction of the banking laws.

## IV

The Board determined in this case that a securities brokerage business that is essentially limited to the purchase and sale of securities for the account of customers, and without provision of investment advice to purchaser or seller, is "closely related" to banking. We hold that the Board's determination is consistent with the language and policies of the BHC Act. We also hold that the Board's determination that the Glass-Steagall Act permits bank holding companies to acquire firms engaged in such a brokerage business is reasonable and supported by the plain language and legislative history of the Act. We therefore affirm the judgment of the Court of Appeals.

*It is so ordered.*