**BOARD OF TRADE OF THE CITY OF CHICAGO and Chicago Mercantile Exchange, Petitioners,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent,**

**and**

**Delta Government Options Corporation, Intervening Respondent.**

No. 90–1246.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 4, 1990.

Decided Feb. 4, 1991.

Rehearing and Rehearing En Banc Denied April 2, 1991.

Mark D. Young, Mitchell F. Hertz, Kirkland & Ellis, Washington, D.C., Garrett B. Johnson, Robert Steigerwald, John H. Stassen, Kirkland & Ellis, Chicago, Ill., for Bd. of Trade of the City of Chicago.

Jerrold E. Salzman, Freeman, Freeman & Salzman, Chicago, Ill., for Chicago Mercantile Exchange.

Daniel L. Goelzer, Anne Chafer, Douglas E. Crow, Joan A. McCarthy, Paul Gonson, S.E.C., Washington, D.C., for S.E.C.

Harold C. Hirshman, Stuart Altschuler, Sonnenschein, Nath & Rosenthal, Chicago, Ill., Catherine A. Ludden, Morgan, Lewis & Bockius, New York City, for Delta Government Options Corp.

Before POSNER and FLAUM, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

POSNER, Circuit Judge.

This case is before us for the second time; familiarity with our first opinion, 883 F.2d 525 (7th Cir.1989), is presumed. The question we must answer this time is whether a system for trading options on federal government securities that has been put together by RMJ, a broker; Delta, a clearing agency; and SPNTCO, a bank (the last playing an essentially custodial role unnecessary to discuss further) is an "exchange" within the meaning of section 3(a)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(1), in which event it must register with the Securities Exchange Commission. The Commission, faced as it was merely with an application by Delta to register as a clearing agency under section 17A(b) of the Act, 15 U.S.C. § 78q–1(b), thought it unnecessary to decide whether the Delta system—as we shall call the trading system put together by the three firms—is an exchange. We disagreed in our first opinion. We held that the Commission could not, as it had done, approve Delta's application without deciding whether the system whose trades it intended to clear could lawfully operate without registering as an exchange. We therefore remanded the case to the Commission for a determination of the system's status. The Commission held that it was not an exchange, and therefore adhered to its decision to register Delta as a clearing house. The Board of Trade and the Chicago Mercantile Exchange again petition for review. They are concerned about competition from the Delta system. We held in our first opinion that this concern gives them standing to challenge the Commission's decision to allow Delta to become a registered clearing house.

An ingenious device for facilitating the purchase and sale of securities, the Delta system works roughly as follows. (We refer the reader to our previous opinion for a more complete and more precise description.) The system specifies the form of option contract that shall be the security traded. Some of the terms of the contract are fixed, such as the maximum term of the option and the day of the month on which it expires. Others are left open to be negotiated by the parties, such as the premium, the exercise price, and the month of expiration. The traders, who consist not only of securities dealers but also of banks, pension funds, and other institutional investors, communicate their buy or sell offers to RMJ, which enters the offers in the system's computer. Delta, the clearing agency, monitors the computer and when it sees a matching buy and sell offer it notifies the traders that they have a deal (but doesn't tell them with whom) and it takes the necessary steps to effectuate the completed transaction. The interposition of Delta between the traders protects the anonymity of each from the other as well as guaranteeing to each that the other will honor the terms of the option traded.

The fixing of some standardized terms so that one trader is not offering to buy apples and the other offering to sell oranges; the guarantees of anonymity and performance; the pooling of buy and sell offers in a single (electronic) place—these essential features of the Delta system are methods for creating a market that will bring together enough buy and sell offers to enable transacting at prices that will approximate the true market values of the things traded. Does this make the Delta system an exchange, that is, "any organization, association, or group of persons ... which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange as that term is generally understood"? There is no doubt that the Delta system creates an electronic marketplace for securities traders, and the petitioners say that no more is required to establish that the system must register as an exchange. The Commission's reply emphasizes the words "generally understood." The Delta system is not—not quite, anyway—what is generally understood by the term "stock exchange." It lacks a trading floor. It lacks specialists, who enhance the liquidity of an exchange by using their own capital to trade against the market when the trading is light, in order to buffer price swings due to the fewness of offers rather than to changes in underlying market values. Not all conventional exchanges have specialists, but those that do not have brokers who trade for their own account as well as for their customers' accounts, and the additional trading enhances the market's liquidity. It is fitting that such brokers are called "market makers." Securities Exchange Act of 1934, § 3(a)(38), 15 U.S.C. § 78c(a)(38). RMJ does not trade for its own account in the Delta system.

The petitioners reply that the words "generally understood" apply only to functions other than the central one of "provid[ing] a market place or facilities for bringing together purchasers and sellers of securities." In other words they want us to put a comma after "sellers of securi-

ties." This done, they argue as follows: the statute defines exchange as any entity that provides a facility for bringing together purchasers and sellers of securities, whether or not in providing that facility it is performing an exchange function as the term exchange is generally understood; the Delta system provides a facility for bringing together purchasers and sellers of securities; therefore Delta is an exchange.

Unless the petitioners can be permitted to add their own punctuation to the statute, we do not think that their reading is any more persuasive, even at the literal level, than the Commission's reading, which places the provision of a market place or of other facilities for bringing securities traders together among those functions performed by a stock exchange as the term is generally understood, and thus subjects "provid[ing] a market place or facilities" to the qualifying force of "generally understood." Moreover, if the petitioners are to be consistent in advancing a "literal" reading of the statute, they should read "bring together" literally too. But even an admitted exchange does not literally "bring together" purchasers and sellers of securities, except when the floor brokers are trading for their own account. It does not bring them into physical propinquity. And a broker's waiting room, which does bring purchasers and sellers of securities into physical propinquity, is not an exchange. We therefore question whether the petitioners have a coherent approach to the interpretation of the statute.

The consequence of their interpretation must also give us pause. The Delta system cannot register as an exchange, because the statute requires that an exchange be controlled by its participants, who must in turn be registered brokers or individuals associated with such brokers. Securities and Exchange Act of 1934, §§ 6(b)(3), (c)(1), 15 U.S.C. §§ 78f(b)(3), (c)(1); Securities Exchange Act Release No. 21439, 49 Fed.Reg. 44577, 44578 (Oct. 31, 1984). So all the financial institutions that trade through the Delta system would have to register as brokers, and RMJ, Delta, and the bank would have to turn over the own-

ership and control of the system to the institutions. The system would be *kaput.* One must question an interpretation of the definitional provision that would automatically prevent competition for·the exchanges from an entity that the exchanges are unable to show poses a threat to the safety of investors by virtue of not being forced to register and assume the prescribed exchange format. As the Commission stresses, each of the three firms that constitute the Delta system is comprehensively regulated; no regulatory gaps are created by declining to place the system itself in the exchange pigeonhole; the only thing that such classification would do would be to destroy the system.

What is true is that the Delta system differs only in degree and detail from an exchange. Its trading floor is a computer's memory. Its structure is designed to encourage liquidity, though not to the same extent as the structure of an exchange is. Section 3(a)(1) is broadly worded. No doubt (considering the time when and·circumstances in which it was enacted) this was to give the Securities and Exchange Commission maximum control over the securities industry. So the Commission could have interpreted the section to embrace the Delta system. But we do not think it was compelled to do so. The statute is not crystal clear; on the contrary, even when read literally, which is to say without regard to context and consequence, it does not support the petitioners' argument without repunctuation of the statute and without overlooking the impossibility of a consistently literal reading. An administrative agency has discretion to interpret a statute that is not crystal clear: *Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 844–45, 104· S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984). The Securities and Exchange Commission can determine better than we generalist judges whether the protection of investor and other interests within the range of the statute is advanced, or retarded, by placing the Delta system in a classification that will destroy a promising competitive innovation in the trading .of ·securities. Of course, if the statute were unambiguous, the Commission would have

to bow. *Board of Governors v. Dimension Financial Corp.,* 474 U.S. 361, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986); *American Bankers Ass'n v. SEC,* 804 F.2d 739, 744 (D.C.Cir.1986). It has not been given the power of statutory revision. But in this case there is enough play in the statutory joints that its decision must be

Affirmed. ·

FLAUM, Circuit Judge, dissenting.

No doubt there is some ambiguity in the statutory definition of "exchange." The ambiguity lies.in the broad formula Congress adopted: "as that term is generally understood." On one point, however, the statute is not ambiguous. An organization that "constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities" is an exchange. The statute makes it unnecessary to speculate whether bringing together buyers and sellers is one of the "generally understood" functions of an exchange; it makes *that* function a determinative characteristic, sufficient unto itself to confer exchange status. Entities that *"otherwise"* perform the functions of a stock exchange—whatever those may be— may also constitute exchanges, but the statute leaves no doubt that bringing together buyers and sellers is the principal function of an exchange. Since—as the majority acknowledges—we cannot ignore an unequivocal statutory mandate, I respectfully dissent from the court's decision to defer to an SEC interpretation that does.

The majority maintains, as did the SEC, that a literal reading of the "bringing together" language is too broad. It would, they assert, bring entities like brokers and dealers within the ambit of the definition, raising the nonsensical prospect that they, too, would have to register as exchanges. Congress foreclosed that possibility, however, by defining "brokers" ·and "dealers" quite differently. A "broker" "is in the business of effecting transactions in securities for the account of others," Securities Exchange Act § 3(a)(4), 15 U.S.C. 78c(a)(4); they are, in short, agents who place orders for principals, their customers. *See Secu-*

*rities Indus. Ass'n v. Board of Governors of the Federal Reserve Sys.*, 468 U.S. 207, 218, 104 S.Ct. 3003, 3009, 82 L.Ed.2d 158 (1984) ("a broker executes orders for the purchase or sale of securities solely as agent"). Exchanges facilitate securities transactions, but do not serve as agents on behalf of the parties to such transactions. Nor do exchanges buy or sell securities for their own accounts, which distinguishes them from "dealers." *See* Securities Exchange Act § 3(a)(5), 15 U.S.C. § 78c(a)(5). We may safely assume that, when Congress adopted specific definitions for brokers and dealers, it did not intend the definition of exchange to apply to them as well. *See Colautti v. Franklin*, 439 U.S. 379, 392 n. 10, 99 S.Ct. 675, 684 n. 10, 58 L.Ed.2d 596 (1979) (as a rule, a definition which declares what a term means excludes any meaning not stated).

We may also assume—as have all parties to this litigation—that Congress intended the definition of exchange to include the New York Stock Exchange, and to exclude the over-the-counter (OTC) market. As the majority observes, buyers and sellers do not come into physical proximity on the floor of the New York Stock Exchange; obviously, the "bringing together" of buyers and sellers refers not to their actual presence but to their offers to trade. Those offers don't meet in a broker's waiting room, but they do meet on the New York Stock Exchange trading floor, and on the Delta System's computer screens. By contrast, buy and sell offers in the OTC market come together only through dealers who interpose themselves between the parties, buying from sellers and selling to buyers; parties rarely negotiate directly. "The OTC market is therefore known as a 'dealer' market." Poser, *Restructuring the Stock Markets: A Critical Look at the SEC's National Market System*, 56 N.Y.U. L.Rev. 883, 895 (1985).

What distinguishes the New York Stock Exchange, and other stock exchanges, from the Delta system, the SEC contends, is that a stock exchange provides a "continuous market," that is, one that provides liquidity. As the majority correctly notes, however, the Delta system is designed to promote liquidity. Participation in the system is limited to those investors "likely to engage in significant trading of Option Contracts ... upon admission to the System." Certain options terms are standardized, and the system includes a $200 million credit enhancement facility that it maintains can "support about $8 billion of option trading." Delta touted itself in announcements as a "centralized, liquid system for the trading of options on U.S. government securities," and while Delta's characterization does not bind us, it is probative of the system's design.

The SEC counters that the system's "participation criterion ... is a far cry from the market making obligations that exist on exchanges to ensure liquidity," Brief at 26, suggesting that it views the absence of "market makers" and "specialists" for the securities traded on the system as the telltale sign that the system is not an exchange. (This is also the only distinction, other than the absence of a tangible trading floor, cited by the majority.) Indeed, the SEC has long maintained that the specialist system is "an essential mechanism for maintaining continuous auction markets." Securities Exchange Act Release No. 7432 (Sep. 24, 1964) (endorsing conclusion of the Report of Special Study of the Securities Markets, H. Doc. No. 95, 88th Cong., 1st Sess., Pt. 2, at 167 (1963)); *see also* Securities and Exchange Commission, Report on the Feasibility and Advisability of the Complete Segregation of the Functions of Dealer and Broker 41 (1936) ("the specialist has an important incentive to maintain a fair and orderly market").

The SEC's emphasis on the market making function seems misplaced, however, because exchanges exist to *eliminate* the need for market makers by bringing buyers and sellers together directly. *LTV Federal Credit Union v. UMIC Gov't Sec.*, 523 F.Supp. 819, 834–35 (N.D. Tex.1981), *aff'd*, 704 F.2d 199 (5th Cir.), *cert. denied*, 464 U.S. 852, 104 S.Ct. 163, 78 L.Ed.2d 149 (1983). Specialists are permitted to trade only when their activity is "reasonably necessary" to maintain a fair and orderly market—*see* New York Stock Exchange Rule

104 (specialists' negative obligation); Rule 104.10(2) (specialists' affirmative obligation)—that is, when the exchange is *illiquid*. Specialists are not parties to the vast majority of trades on stock exchanges. As noted, it is in the OTC market that virtually every trade depends on the availability of a market maker for its execution.

The irony of the SEC's position was not lost on the petitioners. The Exchange Act defines a "market maker" as "any dealer who ... holds himself out (by entering quotations in an inter-dealer communications system or otherwise) as being willing to buy and sell such security for his own account on a regular or continuous basis," § 3(a)(38), 15 U.S.C. § 78c(a)(38), leading the petitioners to submit that, by the SEC's interpretation, OTC market makers would have to register as exchanges. (The SEC protests that OTC market makers don't centralize trading, but neither do specialists on regional exchanges; trading in their stocks is centered in New York.) Perhaps recognizing the incongruity of pointing to the availability of market makers, the SEC ultimately disavowed reliance on this distinction as the critical determinant of whether a market constitutes an exchange, stating that "[n]o sponsor of a System can avoid exchange registration simply by avoiding particular characteristics of traditional exchange markets such as affirmative market making obligations or a limit order book." Order Granting Temporary Registration as a Clearing Agency, Exchange Act Release No. 34–27611, at 50 n. 100 (Jan. 12, 1990).

The SEC's interpretation of exchange status appears to turn, instead, on the volume of trading in a market. The Commission noted that "[i]t is certainly possible that even a system such as the RMJ System *might attract a level of buying and selling interest to develop into a continuous or regular auction market." Id.* at 49–50 (emphasis added). In its brief, however, the SEC cautions *against* associating volume with liquidity. The SEC defines liquidity as the ability of an exchange to give traders a reasonable expectation that they will be able to execute their orders at the prices being quoted when the order is placed. "It is not difficult," the Commission submits,

> to envision a trading system that provides a centralized, liquid marketplace to its participants for the particular securities traded on the system, but, due either to limitations on the class of individuals that may participate or to the subset of securities that may be traded on the system, has a limited overall volume of trading and a *de minimis* impact on the securities market as a whole.

Brief at 30–31.

This is true, as far as it goes. But liquidity and volume are interrelated, and it is useless to talk about one without considering the other. A low-volume exchange can assure liquidity only if its prices mirror the high-volume activity of another exchange. The market makers on the regional stock exchanges, for example, typically engage in "derivative pricing"—using the price quotations of the specialist on the primary exchange—rather than offering their own competitive price quotations. *See* L. LOSS & J. SELIGMAN, SECURITIES REGULATION 2551–52, 2560–62 (1989); Poser, *supra*, at 893. They are not market makers in the true sense of the term, for their prices are determined elsewhere. They compete on service, not price; their principal function, like that of the Delta System, is to execute trades. To the extent that its trading volume increases, the trades on the System may well begin to have an impact on prices, but as the Commission itself observed, with larger volume liquidity increases, and the absence of market makers becomes less worrisome.

In any event, we can be certain that volume plays no role in the determination of whether a market constitutes an exchange, for Congress created a limited volume exemption from registration for markets meeting the statutory definition of an "exchange" on which trading volume does not exceed specified levels. *See* Securities Exchange Act § 5, 15 U.S.C. § 78e. The SEC's definition of exchange would render that exemption meaningless, for low-volume markets would not qualify as ex-

changes and would have no need to avail themselves of the exemption.

The more fundamental objection to the Commission's emphasis on liquidity lies in the Brady Report's observation that liquidity is "something of an illusion." *See* Report of the Presidential Task Force on Market Mechanisms 57 (1988). In today's trading environment, no market, whether or not an exchange, can assure liquidity in all circumstances. If exchange status turns on the *ability* of a trading system to provide liquidity, the New York Stock Exchange isn't an "exchange" under the Securities Exchange Act either. If it turns on the *design* of the system, the Delta System, like the New York Stock Exchange, qualifies.

The majority's interpretation is, it acknowledges, colored by its view that the costs of requiring the system to register as an exchange will outweigh the benefits gained. I recognize that regulation exacts costs, and that regulating the System as an exchange *may* make the endeavor commercially unattractive. I am not convinced, however, that Delta and its partners could not find some way to protect their proprietary interests in the System. Exclusion is not the sole means of protecting a property interest; presumably the System's proprietors could license or sell the technology to the members. Moreover, the System is going to have to establish competitive rates in order to attract customers (there isn't another organized system for trading *options* on government securities, but the *futures* markets provide a good substitute); allowing participants a say as to fees (as it would have to do if registered as an exchange) seems unlikely to spell the System's doom.

Obviously, the Chicago Board of Trade and the Mercantile Exchange did not bring this lawsuit to protect investors. The System represents competition for them, and they would like to hamstring it with as much regulation as possible. Although their potential economic injury is enough to give them standing to bring this case, *see Board of Trade v. Securities Exchange Comm'n*, 883 F.2d 525, 532–33 (7th Cir.

1989), the majority seems to consider it also a reason to decide the case against them. If, asks the majority, requiring the System to register as an exchange accomplishes nothing but restricting competition for the futures exchanges, why should we bother?

We might ask the same question about the New York Stock Exchange. Exchanges must enforce compliance by their members with their own rules and those of the SEC. Securities Exchange Act § 19(g)(1), 15 U.S.C. § 78s(g)(1). Nevertheless, every member of an exchange must also register with the SEC as a broker or dealer, § 3(a)(3)(A), 15 U.S.C. § 78c(a)(3)(A), and the SEC may bypass the exchange to discipline brokers and dealers directly. Securities Exchange Act § 15(b)(4)–(6), 15 U.S.C. § 78o(b)(4)–(6). Even when Congress enacted the 1975 Securities Acts Amendments, with the object of establishing a national market system and increasing competition between stock exchanges and the OTC markets, Congress saw fit to maintain and supplement the regulatory authority of exchanges and to preserve the system of redundant regulation it provided for when it created the Securities Exchange Commission in 1934. *See generally* S.Rep. No. 75, 94th Cong., 1st Sess. (1975).

The SEC itself provides the reason for requiring registration of the System as an exchange. As the Commission observed, "the System is made up of institutional investors who trade for their own accounts with no obligation to conduct their trading in a manner that will ensure a fair and orderly market." Brief at 19–20. But the fact that the System is a private enterprise in which only sophisticated entities will participate is, in my judgment, largely irrelevant. The System's participants may not need the protections of an exchange, but the general public may. The Delta System has the potential to handle a huge volume of trades in government options, and its business is likely to have a direct impact on the underlying market for these securities. As the 1987 and 1989 market "breaks" dramatically illustrated, derivative markets subject to less regulation can drive the prices in less efficient primary markets (efficiency being, of course, the price of stabil-

ity). *See* Brady Report at 15–42, 55–57. The Commission's emphasis on the institutional nature of the System seems to discount the linkage between derivative and primary markets.

Exchanges are required to impose rules on their participants "designed ... in general to protect investors and the public interest." Securities Exchange Act § 6(b)(5), 15 U.S.C. § 78f(b)(5); *see also* Securities Exchange Act § 6(f), 15 U.S.C. § 78f(f) (to maintain fair and orderly markets, Commission may require those trading on an exchange to comply with exchange rules). Exempting the System from exchange registration will create, in effect, another futures market in government securities (hence the opposition of the CBOT and the Merc), one subject to even less regulation than the futures exchanges. Exempting the System may, therefore, exacerbate the problems inherent in the uneasy coexistence of primary and derivative markets under different regulatory regimes. On the other hand, it may be that the way to greater stability in the markets is not more regulation but more efficiency. This is a question for Congress to decide, and it is one that has recently received a great deal of Congressional attention. *See, e.g., Hearings on Financial Regulation and Jurisdictional Issues Before the Subcomm. on Securities of the Senate Comm. on Banking, Housing, and Urban Affairs,* 100th Cong., 2d Sess. (Mar. 29, 1990). The Commission has wide discretion to interpret the securities laws. But it is not free to disregard an unambiguous provision, and Congress was crystal clear that an organization "bringing together purchasers and sellers of securities" constitutes an exchange. Until Congress concludes that its definition of exchange is antiquated and superfluous, I am not prepared to disregard it.