222 F.3d 151 (4th Cir. 2000)
 CAPITOL MORTGAGE BANKERS, INCORPORATED, PLAINTIFF-APPELLEE,
v.
ANDREW M. CUOMO, SECRETARY, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT, DEFENDANTS-APPELLANTS,
AND
MORTGAGE LENDING OF AMERICA, INCORPORATED; CAMERON MORTGAGE COMPANY; FOUR STAR MORTGAGE, LTD.; RLS, INCORPORATED, D/B/A TRINITY MORTGAGE COMPANY; PROGRESSIVE LOAN FUNDING; MORTGAGE CAPITAL RESOURCE CORPORATION, MOVANTS.
NATIONAL TRAINING AND INFORMATION CENTER; SOUTH EAST COMMUNITY ORGANIZATION; PARK REIST CORRIDOR COALITION; ST. AMBROSE HOUSING AID CENTER; ASSOCIATED COMMUNITIES ORGANIZED FOR REFORM NOW, AMICI CURIAE.
 No. 00-1036
 UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
 Argued: May 1, 2000
July 12, 2000
As Amended August 2, 2000
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. Marvin J. Garbis, District Judge. (CA-99-2907-MJG)ARGUED: Howard Stanley Scher, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Mitchel Howard Kider, WEINER, BRODSKY, SIDMAN & KIDER, P.C., Washington, D.C., for Appellee. ON BRIEF: David W. Ogden, Acting Assistant Attorney General, Lynne A. Battaglia, United States Attorney, Michael Jay Singer, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Carole Wilson, Angelo W. Aiosa, Clare Harrigan, Office of General Counsel, U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, Washington, D.C., for Appellants. Denis J. Murphy, CIVIL JUSTICE, INC., Baltimore, Maryland, for Amici Curiae.
 Before Murnaghan, Wilkins, and Williams, Circuit Judges.
 Reversed by published opinion. Judge Murnaghan wrote the opinion, in which Judge Wilkins and Judge Williams joined.
 OPINION
 Murnaghan, Circuit Judge.
 
 
 1
 Capitol Mortgage Bankers, Inc. ("Capitol") filed an action challenging the termination of its authority to originate single family home mortgages insured by the Federal Housing Administration ("FHA"). The Department of Housing and Urban Development ("HUD"), which oversees the FHA home mortgage program, terminated Capitol's authority to originate FHA-insured mortgages because of an unacceptably high default and claim rate, pursuant to the agency's termination regulation, 24 C.F.R. § 202.3(c)(2). We must decide whether HUD exceeded its statutory authority by enacting the termination regulation, and whether HUD denied Capitol due process of law by relying on informal procedures in the termination action. Because we answer both questions in the negative, we reverse the district court's order granting summary judgment in favor of Capitol.
 
 I.
 
 2
 The National Housing Act, 12 U.S.C. § 1701 et seq. ("the Act") was passed by Congress to promote the availability of low and moderate income housing. Under the Act, Congress created the Federal Housing Administration, which operates a program to insure private lenders against loss on home mortgage loans, thereby making those loans more widely available to a greater portion of the population. Private lenders are authorized by HUD to originate FHA-insured home mortgage loans with a document called an Origination Approval Agreement (OAA). Since the FHA program loses money when too many loans default, and as a result too many lenders submit claims to cover those losses, the Secretary of HUD is directed by Congress to "take appropriate actions to reduce losses" under the Act. See 12 U.S.C. § 1709(r).
 
 
 3
 In 1987, Congress enacted the Housing and Community Development Act, Public Law No. 100-242, which included specific directives as to the appropriate actions which should be taken to reduce losses in the FHA program. One provision of the law, codified at 12 U.S.C. § 1735f-11, directed the HUD Secretary to review annually the rates of "early serious defaults and claims" involving lenders under the Act, and to require lenders experiencing a rate of early defaults and claims that was higher than normal to submit a report that would explain the reasons for the high rate and, "if applicable," set forth a plan for corrective action. Specifically, 12 U.S.C. § 1735f-11 provided:
 
 
 4
 Direction to Secretary to require mortgagees with above normal rates of early, serious defaults and claims to submit reports and take corrective action
 
 
 5
 (a) To reduce losses in connection with mortgage insurance programs under this Act, the Secretary shall review at least once a year, the rate of early serious defaults and claims involving mortgagees approved under this Act. On the basis of this review, the Secretary shall notify each mortgagee which, as determined by the Secretary, had a rate of early serious defaults and claims during the preceding year which was higher than the normal rate for the geographic area or areas in which that mortgagee does business. In the notifica tion, the Secretary shall require each mortgagee to submit a report, within a time determined by the Secretary, contain ing the mortgagee's (1) explanation for the above normal rate of early serious defaults and claims; (2) plan for correc tive action, if applicable, both with regard to (A) mortgages in default; and (B) its mortgage-processing system in gen eral; and (3) a timeframe within which this corrective action will be begun and completed. If the Secretary does not agree with this timeframe or plan, a mutually agreeable timeframe and plan will be determined.
 
 
 6
 (b) Failure of the mortgagee to submit a report required under subsection (a) within the time determined by the Sec retary or to commence or complete the plan for corrective action within the timeframe agreed upon by the Secretary may be cause for suspension of the mortgagee from partici pation in programs under this Act.
 
 
 7
 In 1990, HUD promulgated a regulation to comply with the statutory directive contained in § 1735f-11. The regulation was codified at 24 C.F.R. § 202.12(c), and required lenders with a high default rate who are so notified by the HUD Secretary to submit a report with an explanation for the high default rate and, "if required by the Secretary," a plan for corrective action.
 
 
 8
 Two years later, in 1992, HUD promulgated another regulation targeting FHA lenders with high default rates, which we will refer to as the "termination regulation." Codified at 24 C.F.R. § 202.3(c)(2), the termination regulation authorized HUD to terminate a lender's OAA if the lender's default rate is found by the Secretary to be more than 200% of the normal rate. Specifically, the termination regulation stated:
 
 
 9
 (2) Termination of the origination approval agreement --
 
 
 10
 (ii) Effect of default and claim rate determination.
 
 
 11
 (A) The Secretary may notify a mortgagee that its origination approval agreement will terminate 60 days after notice is given, if the mortgagee had a rate of defaults and claims on insured mortgages originated in an area which exceeded 200 percent of the normal rate, and exceeded the national default and claim rate for insured mortgages....
 
 
 12
 (B) Before the Secretary sends the termination notice, the Secretary shall review the census tract area concentrations of the defaults and claims. If the Secretary determines that the excessive rate is the result of mortgage lending in under-served areas, the Secretary may determine not to termi nate the origination approval agreement.
 
 
 13
 (C) Prior to termination the mortgagee may request an informal conference with the Deputy Assistant Secretary for Single Family Housing or that official's designee. After considering relevant reasons and factors beyond the mortgagee's con trol that contributed to the excessive default and claim rates, the Deputy Assistant Secretary for Single Family Housing or designee may withdraw the termination notice and notify the mortgagee that it is being placed on credit watch status.
 
 
 14
 24 C.F.R. § 202.3(c)(2).
 
 
 15
 Thus, under the termination regulation, which is being challenged in this case, the Secretary can terminate a lender's authority to originate FHA loans based only on a high default rate and an informal conference, and without any proposal or consideration of a corrective action plan.
 
 II.
 
 16
 Capitol Mortgage Bankers, Inc. is a mortgage company established in 1989 and headquartered in Maryland. Capitol provided residential mortgage loans to first-time home buyers and low to moderate income and minority home buyers. HUD approved Capitol to originate FHAinsured home mortgage loans, and the majority of Capitol's business involved origination of FHA-insured loans.
 
 
 17
 In May of 1999, HUD sent a letter to all approved lenders indicating HUD's intent to terminate OAA's in areas where the lender had a high rate of early default and claims. HUD cited its authority to do so under the termination regulation, 24 C.F.R. § 202.3(c).
 
 
 18
 By letter dated June 4, 1999, HUD notified Capitol of its intent to terminate Capitol's OAA for all Capitol branch offices located within HUD's Baltimore, Washington, DC, and Richmond field office jurisdictions. In accordance with the termination regulation, Capitol requested an informal conference to include both written and oral submissions. Capitol then proceeded to compile a voluminous submission documenting the reasons why HUD should not terminate Capitol's participation in the FHA program. In response, HUD scheduled a conference.
 
 
 19
 At the conference, Capitol made its oral submissions and answered some questions from the HUD officials present. HUD did not present any support for its termination decision; it merely allowed Capitol to present its reasons for opposing the termination.
 
 
 20
 In September of 1999, the Deputy Assistant Secretary for Single Family Housing notified Capitol that he was sustaining the termination of Capitol's OAA in the three identified jurisdictions. Capitol immediately filed this action under the Administrative Procedure Act, 5 U.S.C. § 702, to review the final action by HUD terminating Capitol's loan origination approval authority. Capitol has claimed that HUD exceeded its statutory authority under the Act, 12 U.S.C. § 1735f-11, by enacting the termination regulation, and that HUD denied Capitol due process of law by using an informal conference as the basis for the termination action. HUD has claimed that the termination regulation is consistent with the Act and that Capitol was afforded adequate safeguards in the procedures used during the termination action. The District Court considered cross-motions for summary judgment, and after the parties agreed that there were no issues of fact, considered the case for a decision on the record. After a hearing, the District Court found in favor of Capitol on both grounds and set aside the termination. The government now appeals.
 
 III.
 
 21
 Our review of the District Court's order invalidating HUD's termination regulation is de novo. Henson v. Liggett Group, Inc., 61 F.3d 270, 274 (4th Cir. 1995). We must determine whether HUD, in its termination regulation, has adopted a permissible interpretation of 12 U.S.C. § 1735f-11, or more precisely, whether HUD's interpretation is "a reasonable construction of the statutory language and is consistent with legislative intent." Doolin Sec. Sav. Bank, F.S.B. v. F.D.I.C., 53 F.3d 1395, 1400 (4th Cir. 1995) (quoting Securities Indus. Ass'n. v. Board of Governors of the Fed. Reserve Sys., 486 U.S. 207, 217 (1984)).
 
 
 22
 The Supreme Court has developed a test for determining whether an agency regulation exceeds the agency's statutory authority. In the now well-known passage from Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984), the Court stated that
 
 
 23
 [W]hen a court reviews an agency's construction of the stat ute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Con gress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.... [I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
 
 
 24
 (footnotes omitted). Thus, the first question is whether Congress has directly spoken to the precise question at issue - namely, whether HUD is required to consider a corrective action plan before terminating a lender's OAA, where the lender's default rate exceeds 200% of the normal default rate.
 
 
 25
 Section 533 of the Act, 12 U.S.C. § 1735f-11, states that the HUD Secretary "shall require each mortgagee to submit a report... containing the mortgagee's (1) explanation for [the high default rate]; (2) plan for corrective action, if applicable, both with regard to (A) mortgages in default; and (B) its mortgage processing system in general; and (3) a timeframe within which this corrective action plan will be begun and completed."
 
 
 26
 Use of the word "shall" is not ambiguous - the HUD Secretary is required to take the steps outlined above when dealing with a lender who has an abnormally high default rate. However, those steps must include a corrective action plan only "if applicable." Congress did not indicate under which circumstances a corrective action plan would be applicable. Thus, there is silence on the relevant matter and Congressional intent is not clear. We must therefore proceed to the second step of the Chevron analysis and consider, with deference to HUD's expertise in this area, whether the agency's interpretation of the statute, as embodied in the termination regulation, is based on a permissible construction of the statute.
 
 
 27
 HUD interprets the statute to mean that if a lender's default rate exceeds 200% of the normal rate, a corrective action plan is not applicable. Because a default rate in excess of 200% of the normal rate suggests a serious threat to the long term health of the FHA insurance program, we do not think HUD's interpretation is unreasonable. HUD needs to quickly and efficiently root out poor performing lenders. Its consideration of this need in determining when a corrective action plan is applicable is consistent with Congress' mandate that HUD "take appropriate actions to reduce losses" under the Act. See 12 U.S.C. § 1709(r). We therefore hold that HUD's interpretation of Section 533 of the National Housing Act, 12 U.S.C.§ 1735f-11, is permissible, and the termination regulation is valid.
 
 IV.
 
 28
 Capitol next argues that the informal procedures used by HUD in the termination action violate its due process rights. "The fundamental requirement of due process is the opportunity to be heard `at a meaningful time and in a meaningful manner.'" Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)). "Due process is flexible and calls for such procedural protections as the particular situation demands." Id. at 334 (quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).
 
 
 29
 Based on these principles, the Supreme Court has developed a three factor balancing test to determine what type of process is due before the government can deprive a person or entity of a protected interest:
 
 
 30
 [I]dentification of the specific dictates of due process gener ally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
 
 
 31
 Id. at 335.
 
 
 32
 In this case, the private interest affected by HUD's action is significant. Capitol's business relied primarily on origination of FHAinsured home mortgage loans. The risk of error in the termination action, however, is minimal. Although HUD relied upon an informal hearing, it also considered detailed, expert evaluations of objective data, as well as Capitol's own voluminous submission, in rendering its termination decision. Capitol was given notice of the pending termination proceedings and an opportunity to be heard, which, as the Supreme Court has stated, form the "essence of due process." Eldridge, 424 U.S. at 348. Finally, the government's interest in prompt termination of lenders who threaten the FHA insurance program is considerable. HUD is responsible for protecting the overall health of the FHA insurance program, so that the benefits of that program will remain available to home buyers in the future. The additional time and costs associated with a formal hearing would substantially burden HUD's ability to discharge its duties efficiently.
 
 
 33
 Upon consideration of the Eldridge factors, we find that the informal procedures used by HUD in its termination proceedings provided adequate procedural safeguards and do not constitute a denial of due process of law. Our conclusion finds support in Doolin Sec. Sav. Bank, F.S.B. v. FDIC, 53 F.3d 1395 (4th Cir. 1995). In Doolin, the FDIC terminated the Doolin Security Savings Bank's participation in the FDIC insurance program. The bank challenged the agency's action and claimed that the informal procedures relied upon by the FDIC violated the bank's due process rights. Those procedures involved advance notice of the action proposed by the agency and an opportunity to present a written submission opposing the proposed action. After considering the Eldridge factors, this court held that the informal procedures used by the FDIC satisfied due process. Because the private and governmental interests at stake in Doolin are similar to those in the instant case, and the procedures challenged in this case are in fact more extensive than those upheld in Doolin, we find that Capitol's due process challenge must fail.
 
 
 34
 HUD's treatment of Capitol was fair and reasonable. We therefore hold that HUD did not deny Capitol due process of law by relying on informal procedures in the termination action.
 
 V.
 
 35
 For the foregoing reasons, the District Court's order granting summary judgment in favor of Capitol Mortgage and invalidating HUD's termination regulation is
 
 
 36
 REVERSED.